# EXHIBIT A

District 1

# Case Summary

### Case No. 2025CH04542

| | | | |
|---|---|---|---|
| **Schramm Law Group, LLC-vs-Pitney Bowes Inc.** | § | Location: | **District 1** |
| | § | Judicial Officer: | **Calendar, 5** |
| | § | Filed on: | **04/23/2025** |
| | § | Cook County Attorney Number: | **41106** |

---

## Case Information

| | |
|---|---|
| Case Type: | Class Actions |
| Case Status: | **04/23/2025**    **Pending** |

---

## Assignment Information

**Current Case Assignment**

| | |
|---|---|
| Case Number | 2025CH04542 |
| Court | District 1 |
| Date Assigned | 04/23/2025 |
| Judicial Officer | Calendar, 5 |

---

## Party Information

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **Schramm Law Group, LLC** | **Edelman, Daniel A.** *Retained* <br> 20 South CLARK ST <br> STE 1500 <br> Chicago, IL 60603 |
| **Defendant** | **Pitney Bowes Inc.** | |

---

## Events and Orders of the Court

07/03/2025   **Case Management**    (9:30 AM)    (Judicial Officer: Cohen, Neil H)
       Resource: Location CH2308 Court Room 2308
       Resource: Location D1 Richard J Daley Center

04/25/2025    

       Summons - Retd P.S.
         *Summons Returned Executed as to Pitney Bowes Inc.*
         Party:    Plaintiff Schramm Law Group, LLC
         *Summons Returned Executed as to Pitney Bowes Inc.*

04/23/2025    New Case Filing

04/23/2025    

       Class Action Complaint Filed
         *Complaint - Class Action*
         Party:    Plaintiff Schramm Law Group, LLC
         Party 2:    Attorney Edelman, Daniel A.
         *Complaint - Class Action*

04/23/2025    

       Summons Issued And Returnable
         *Summons as to Pitney Bowes Inc.*
         Party:    Plaintiff Schramm Law Group, LLC
         Party 2:    Attorney Edelman, Daniel A.
         *Summons as to Pitney Bowes Inc.*

04/23/2025    

       Exhibits Filed
         *Plaintiff's Motion for Class Certification*
         Party:    Plaintiff Schramm Law Group, LLC
         Party 2:    Attorney Edelman, Daniel A.
         *Plaintiff's Motion for Class Certification*

Hearing Date: 7/3/2025 9:30 AM
Location: Court Room 2308
Judge: Cohen, Neil H

Case: 1:25-cv-05830 Document #: 1-1 Filed: 05/27/25 Page 4 of 72 PageID #:10

For updated information about your case including hearings, subsequent filings
and other case information, please visit our Online Case Search
and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

Atty. No. 41106

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
4/23/2025 12:56 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04542
Calendar, 5
32398185

SCHRAMM LAW GROUP, LLC,
on behalf of Plaintiff and the class
members described herein,

        Plaintiff,

   vs.                            **2025CH04542**

PITNEY BOWES INC.,

        Defendant.

**COMPLAINT – CLASS ACTION**

**INTRODUCTION**

1.     Plaintiff Schramm Law Group, LLC brings this action to secure redress against the practice of Pitney Bowes Inc. of programming the chips in its ink cartridges to cause its postage machines to display a low ink warning and to stop operating when the cartridges had ample ink to continue operating.

**PARTIES**

2.     Plaintiff Schramm Law Group, LLC, is a law firm organized as an Illinois limited liability company with offices at 240 E. Lake St., Suite 101A, Addison, IL 60101.

3.     Defendant Pitney Bowes Inc. is a Delaware corporation with its principal place of business at 3001 Summer Street, Stamford, Connecticut 06926. It does business in Illinois. Its registered agent and office is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703-4261.

4.     Defendant manufactures and sells mailing and postage machines, as well as replacement ink cartridges for its machines.

1

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

## FACTS

5.      Plaintiff leased a Mailstation2 postage machine from Defendant beginning August 25, 2017.

6.      The lease agreement is in Appendix A.

7.      Terms and conditions referred to in the lease agreement are in Appendix B.

8.      Originally, the machine would display low ink warning but continue operating.

9.      During the last three years prior to the filing of this action, the machine would display a low ink warning and  stop operating.

10.      Pitney Bowes programmed the chip in the ink cartridge to interact with the machine to cause the machine to stop operating when it displayed a low ink warning.

11.      The ink cartridge would not in fact be out of ink when the low ink warning was displayed.

12.      Pitney Bowes, without any specific request, would regularly send ink cartridges, charging Plaintiff's credit card, which Pitney Bowes had on file.  On information and belief, the chip also triggered the sending of ink cartridges.

13.      When the machines stop working because of "empty" ink cartridges, a significant amount of ink actually remains in the cartridges.

14.      Purchasers of ink cartridges have a reasonable expectation, when buying ink cartridges, that they have bought all the ink in the cartridge.

15.      Purchasers will continue using cartridges until they can tell by degraded print quality that ink is in fact running out.

16.      Pitney Bowes programmed the  chip in its cartridges to cause the machine to display a low ink warning and stop operating when the ink cartridge had ample ink to continue operating.

17.      Pitney Bowes did this to increase its profits by forcing lessees of its machines to purchase more ink from it.

18.      Pitney Bowes did not disclose that the replacement cartridges had been programmed

to cause the machine to stop operating prematurely.

19.     Lessees, including Plaintiff, were financially injured when their machines ceased operating as a result of premature warnings of ink depletion and cartridge expiration and when they are caused to purchase new cartridges before the old ones have really run out of ink.

20.     Initially, Plaintiff replaced its ink cartridges early, unknowingly throwing away excess toner.

21.     Plaintiff and other members of the class were damaged.

## COUNT I – UNFAIR PRACTICE

22.     Plaintiff incorporates paragraphs 1-21.

23.     Defendant Pitney Bowes engaged in unfair practices, in violation of 815 ILCS 505/2, when it programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

24.     Defendant engaged in such practice in the course of trade and commerce in postage machines and replacement ink.

25.     Defendant engaged in such practice for the purpose of obtaining money from Plaintiff and the class members.

## CLASS ALLEGATIONS

26.      Plaintiff brings this claim on behalf of a class.

27.     The class consists of (a) all persons with Illinois addresses (b) who leased a postage machine from Defendant (c) which lease was outstanding at any time during the three years prior to the filing of this action.

28.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

29.     On information and belief, there are more than 40 class members, and the class is so numerous that joinder of all members is not practicable.

30.     There are questions of law and fact common to the class members, which common

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

questions predominate over any questions relating to individual class members. The predominant common questions are:

    a.    Whether Defendant Pitney Bowes programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

    b.    Whether Defendant's practices are unfair.

31.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

32.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

33.    A class action is appropriate for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class members and against Defendant for:

    i.    Compensatory damages;

    ii.    Punitive damages;

    iii.    Attorney's fees, litigation expenses and costs of suit;

    iv.    Such other and further relief as the Court deems proper.

## COUNT II – DECEPTIVE PRACTICE

34.    Plaintiff incorporates paragraphs 1-21.

35.    Defendant Pitney Bowes engaged in deceptive practices, in violation of 815 ILCS 505/2, when it programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating, and failed to disclose this to lessees of its postage machines.

4

FILED DATE: 4/23/2025 12:56 PM  2025CH04542

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

36.     Defendant engaged in such practice in the course of trade and commerce in postage machines and replacement ink.

37.     Defendant engaged in such practice for the purpose of obtaining money from Plaintiff and the class members.

## CLASS ALLEGATIONS

38.      Plaintiff brings this claim on behalf of a class.

39.     The class consists of (a) all persons with Illinois addresses (b) who leased a postage machine from Defendant (c) which lease was outstanding at any time during the three years  prior to the filing of this action.

40.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

41.     On information and belief, there are more than 40 class members, and the class is so numerous that joinder of all members is not practicable.

42.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

a.     Whether Defendant Pitney Bowes programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

b.     Whether Defendant Pitney Bowes disclosed this to lessees of its postage machines;

c.     Whether Defendant's practices are deceptive.

43.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and consumer litigation.

44.     Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

45.     A class action is appropriate  for the fair and efficient adjudication of this matter, in that:

        a.     Individual actions are not economically feasible.

        b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class members and against Defendant for:

        i.     Compensatory damages;

        ii.     Punitive damages;

        iii.     Attorney's fees, litigation expenses and costs of suit;

        iv.     Such other and further relief as the Court deems proper.

## COUNT III – GOOD FAITH AND FAIR DEALING

46.     Plaintiff incorporates paragraphs 1-21.

47.     Implied in the contracts between Defendant Pitney Bowes and its lessees is a covenant of good faith and fair dealing.

48.     Defendant breached that covenant when it programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating, and failed to  disclose this to lessees of its postage machines.

## CLASS ALLEGATIONS

49.      Plaintiff brings this claim on behalf of a class.

50.     The class consists of (a) all persons (b) who leased a postage machine from Defendant (c) which lease was outstanding at any time during the five years  prior to the filing of this action.

51.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

52.     On information and belief, there are more than 40 class members, and the class is so numerous that joinder of all members is not practicable.

6

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

53.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

      a.     Whether Defendant Pitney Bowes programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

      b.     Whether such conduct violates the duty of good faith and fair dealing.

54.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and consumer litigation.

55.     Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

56.     A class action is appropriate  for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class members and against Defendant for:

      i.     Compensatory damages;

      ii.     Costs of suit;

      iii.     Such other and further relief as the Court deems proper.

## COUNT IV – UNJUST ENRICHMENT

57.     Plaintiff incorporates paragraphs 1-21.

58.     Defendant engaged in unjust and inequitable conduct when it programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating, and failed to  disclose this to lessees of its postage machines.

7

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

59. As a result, Defendant unjustly enriched itself at the expense of Plaintiff and class members.

## CLASS ALLEGATIONS

60. Plaintiff brings this claim on behalf of a class.

61. The class consists of (a) all persons (b) who leased a postage machine from Defendant (c) which lease was outstanding at any time during the five years prior to the filing of this action.

62. Plaintiff may alter the class definition to conform to developments in the case and discovery.

63. On information and belief, there are more than 40 class members, and the class is so numerous that joinder of all members is not practicable.

64. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether Defendant Pitney Bowes programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

    b. Whether Defendant Pitney Bowes disclosed this to lessees of its postage machines;

    c. Whether Defendant's practices are inequitable, such as to result in unjust enrichment.

65. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

66. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

67. A class action is appropriate for the fair and efficient adjudication of this matter, in

8

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class members and against Defendant for:

      i.     Appropriate damages;

      ii.     Costs of suit;

      iii.     Such other and further relief as the Court deems proper.

## COUNT V – TRESPASS TO CHATTELS

68.     Plaintiff incorporates paragraphs 1-21.

69.     Defendant programmed its cartridges and printers to deprive Plaintiff of the benefit of the ink remaining in the cartridges.

70.     Such conduct amounts to a trespass to chattels.

## CLASS ALLEGATIONS

71.      Plaintiff brings this claim on behalf of a class.

72.     The class consists of (a) all persons (b) who leased a postage machine from Defendant (c) which lease was outstanding at any time during the five years prior to the filing of this action.

73.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

74.     On information and belief, there are more than 40 class members, and the class is so numerous that joinder of all members is not practicable.

75.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

      a.     Whether Defendant Pitney Bowes programmed the chip in the ink cartridge

9

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

b.     Whether Defendant Pitney Bowes disclosed this to lessees of its postage machines;

c.     Whether Defendant's practices amount to trespass to chattels.

76.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and consumer litigation.

77.     Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

78.     A class action is appropriate  for the fair and efficient adjudication of this matter, in that:

a.     Individual actions are not economically feasible.

b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class members and against Defendant for:

i.     Compensatory and punitive damages;

ii.     Costs of suit;

iii.     Such other and further relief as the Court deems proper.

## COUNT VI – CONVERSION

79.     Plaintiff incorporates paragraphs 1-21.

80.     Plaintiff had the right to use all of the ink in the cartridges he purchased.

81.     When Defendant programmed its cartridges and printers to deprive Plaintiff of the benefit of the ink remaining in the cartridge, it converted the remaining ink.

## CLASS ALLEGATIONS

82.     Plaintiff brings this claim on behalf of a class.

83.     The class consists of (a) all persons (b) who leased a postage machine from

10

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

Defendant (c) which lease was outstanding at any time during the five years prior to the filing of this action.

84.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

85.     On information and belief, there are more than 40 class members, and the class is so numerous that joinder of all members is not practicable.

86.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

      a.     Whether Defendant Pitney Bowes programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

      b.     Whether Defendant Pitney Bowes disclosed this to lessees of its postage machines;

      c.     Whether Defendant's practices result in conversion of ink owned and possessed by Plaintiff.

87.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained counsel experienced in class actions and consumer litigation.

88.     Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

89.     A class action is appropriate  for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class members and against Defendant for:

i.        Appropriate damages;

ii.      Costs of suit;

iii.     Such other and further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Madeline Brashear
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
Dedelman@edcombs.com
tgoodwin@edcombs.com
mbrashear@edcombs.com
Atty. No. 41106 (Cook)

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

# **APPENDIX A**

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

**pitney bowes**

# Lease Agreement

Agreement Number

## Your Business Information

**Full Legal Name of Lessee / DBA Name of Lessee**

SCHRAMM LAW GROUP

**Tax ID # (FEIN/TIN)**

**Sold-To: Address**

| **Sold-To: Contact Name** | **Sold-To: Contact Phone #** | **Sold-To: Account #** |
|---|---|---|
| Adam Schramm | | |

**Bill-To: Address**

| **Bill-To: Contact Name** | **Bill-To: Contact Phone #** | **Bill-To: Account #** | **Bill-To: Email** |
|---|---|---|---|
| Adam Schramm | | | |

**Ship-To: Address**

| **Ship-To: Contact Name** | **Ship-To: Contact Phone #** | **Ship-To: Account #** |
|---|---|---|
| Adam Schramm | | |

**PO #**

## Your Business Needs

| Qty | Item | Business Solution Description |
|---|---|---|
| 1 | MAILSTATION | Mailstation2 |
| 1 | K7M0 | K7M0 - Mailstation2 Meter |
| 1 | K7SA | K7SA Profession Install - Mailstation2 |
| 1 | M0L2 | Mailstation2 with 2lb Scale and 10 Accts |
| 1 | PB-4000-US | SmartLink: LVM WiFi/LAN analytics device |
| 1 | SJK7 | SoftGuard for Mailstation2 |
| 1 | STDSLA | Standard SLA-Equipment Service Agreement (for Mailstation2) |

## Your Payment Plan

**Initial Term: 36 months**

**Initial Payment Amount:**

| Number of Months | Monthly Amount | Billed Quarterly at* |
|---|---|---|
| 36 | $ 24.00 | $ 72.00 |

*Does not include any applicable sales, use, or property taxes which will be billed separately.

( ) Tax Exempt Certificate Attached
( ) Tax Exempt Certificate Not Required

(X) Purchase Power® transaction fees included
( ) Purchase Power® transaction fees extra

©2017 Pitney Bowes Inc. All rights reserved.
Doc ID: 20170825103313524
Sertifi Electronic Signature

Y100726976
See Pitney Bowes Terms for additional terms and conditions

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

## Your Signature Below

By signing below, you agree to be bound by all the terms of this Agreement including the Pitney Bowes Terms (Version 7/17), which are available at http://www.pb.com/termsconditions and are incorporated by reference. You acknowledge that you may not cancel the lease for any reason and that all payment obligations are unconditional. The lease will be binding on us after we have completed our credit and documentation approval process and have signed below. The lease requires you either to provide proof of insurance or participate in the ValueMAX® equipment protection program (see Section 16 of the Pitney Bowes Terms) for an additional fee. If software is included in the Order, additional terms apply which are available by clicking on the hyperlink for that software located at http://www.pitneybowes.com/us/license-terms-of-use/software-and-subscription-terms-and-conditions.html. Those additional terms are incorporated by reference.

E-Signed : 08/25/2017 11:35 AM EDT

Title: Owner
IP: ▮▮▮▮▮▮▮▮▮▮      Sertifi Electronic Signature
                  DocID: 20170825103313524

| Lessee Signature | Pitney Bowes Signature |
|---|---|
| Print Name | Print Name |
| Title | Title |
| Date | Date |
| Email Address | |

## Sales Information

Tonya Ward

tonya.ward@pb.com

Account Rep Name                              Email Address

©2017 Pitney Bowes Inc. All rights reserved.
Doc ID: 20170825103313524
Sertifi Electronic Signature                                        See Pitney Bowes Terms for additional terms and conditions

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

**Your Signature Below**

By signing below, you agree to be bound by all the terms of this Agreement including the Pitney Bowes Terms (Version 7/17), which are available at http://www.pb.com/termsconditions and are incorporated by reference. You acknowledge that you may not cancel the lease for any reason and that all payment obligations are unconditional. The lease will be binding on us after we have completed our credit and documentation approval process and have signed below. The lease requires you either to provide proof of insurance or participate in the ValueMAX® equipment protection program (see Section 16 of the Pitney Bowes Terms) for an additional fee. If software is included in the Order, additional terms apply which are available by clicking on the hyperlink for that software located at http://www.pitneybowes.com/us/license-terms-of-use/software-and-subscription-terms-and-conditions.html. Those additional terms are incorporated by reference.

E-Signed : 08/25/2017 11:35 AM EDT

Title: Owner
IP:                    Sertifi Electronic Signature
                       DocID: 20170825103313524

| Lessee Signature | Pitney Bowes Signature |
| --- | --- |
| Print Name | Print Name |
| Title | Title |
| Date | Date |
| Email Address | |

**Sales Information**

Tonya Ward                          tonya.ward@pb.com

Account Rep Name                    Email Address

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

# **APPENDIX B**

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

**PITNEY BOWES TERMS**

Thank you for choosing Pitney Bowes products and services. Please read these Terms carefully. These Terms and the executed order (the "**Order**") make up your agreement with Pitney Bowes (this "Agreement").

Let's start with a few definitions that should help you better understand your agreement. "**PBI**" means Pitney Bowes Inc. "**Pitney Bowes**" means PBI and its subsidiaries. "**We**", "**our**" or "**us**" refers to the Pitney Bowes companies with whom you've entered into the Order. "**You**" or "**your**" refers to the entity identified on the Order. "**Meter**" means any postage meter supplied by PBI under the Order, including (i) in the case of a Connect+®, a SendPro® P series or a SendPro C series mailing system, the postal security device, the application platform or tablet interface, the system controller and the print engine and (ii) in the case of all other mailing systems, the postal security device, the user interface or keyboard and display and the print engine. "**Equipment**" means the equipment listed on the Order, excluding any Meter, standalone software, and SendKit equipment, which is provided in connection with a subscription for the SendPro service. "**Lease**" means Lease terms and conditions set out in Sections 11 through 17.

The provisions included in these Terms consist of: (i) General Terms; (ii) Lease Terms; (iii) a Service Level Agreement; (iv) Equipment and Postage Meter Rental Terms; (v) an Acknowledgement of Deposit required by the United States Postal Service in any transaction involving a Meter; (vi) Purchase Power® Terms for a limited purpose credit line that may be available to you; and (vii) provisions relating to specific products.

**GENERAL TERMS**

**1.    Warranties**

We warrant that all PBI-branded equipment ("**PBI Equipment**") will be free from defects in material and workmanship and will perform according to the operator guides for a period of ninety days from the date (i) the PBI Equipment is installed at your location when PBI installs the PBI Equipment for you or (ii) the PBI Equipment is delivered to you when you can install it yourself. The DI2000™ inserting system has its own unique warranty that you can see at pitneybowes.com/us/di2000-terms.html.

(a)    A defect doesn't include the failure of rates within a rate update to conform to published rates.

(b)    We warrant that any service ("**Service**") we perform under the Service Level Agreement set out in Sections 18 through 23 (the "**SLA**") will be performed in a professional and workmanlike manner.

(c)    **Your sole remedy for a warranty claim is to have us repair or replace the PBI Equipment or, in the case of defective Service, reperform the Service.**

(d)    There is no warranty for PBI Equipment that needs to be repaired or replaced because of any Excluded Circumstance. "**Excluded Circumstances**" are circumstances outside of PBI's control, including an accident, your negligent or reckless use of the equipment, use of the equipment which exceeds our recommendations or in a way not authorized by this Agreement or any operator guide, use of the equipment in an environment with unsuitable humidity, line voltage, damage in transit, software virus, loss of data, loss or fluctuation of power, fire, flood or other natural causes, and other external forces beyond our control. The warranty also does not apply if someone other than us services the equipment, you don't use required software updates, you use the equipment with any system where we have told you that we will no longer provide support or that we have advised you is no longer compatible, or you use third party supplies (such as ink), hardware or software that results in (i) damage to equipment (including damage to printheads), (ii) poor indicia, text or image print quality, (iii) indicia readability failures or (iv) a failure to print indicia, text or images.

Pitney Bowes Terms (Version 7/17)
©2017 Pitney Bowes Inc. All rights reserved. Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM  2025CH04542

(e)    The print engine(s), print engine components, structural components and printed circuit board assemblies supplied with the PBI Equipment may be reclaimed, reconditioned or remanufactured.  These items are warranted to perform according to the same standards as the equivalent new item.

(f)    The warranty doesn't cover ink, ink rollers, toner and drum cartridges, ribbons and similar items (**"Consumable Supplies"**).

(g)    **EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, WE (ON BEHALF OF OURSELF AND OUR SUPPLIERS) MAKE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A  PARTICULAR PURPOSE AS TO THE EQUIPMENT OR SERVICES.  WE MAKE NO REPRESENTATION OR WARRANTY AS TO ANY THIRD PARTY EQUIPMENT.  WE AGREE TO PASS THROUGH TO YOU ALL THIRD PARTY EQUIPMENT WARRANTIES TO THE EXTENT PERMITTED.**

## 2.    Limitation of Liability

**OUR TOTAL LIABILITY (INCLUDING ANY LIABILITY OF OUR SUPPLIERS) IS LIMITED TO THE FEES PAID BY YOU FOR THE APPLICABLE EQUIPMENT OR SERVICES. NEITHER WE NOR OUR SUPPLIERS IS LIABLE FOR ANY:** (I) DAMAGE YOU MAY INCUR BY REASON OF YOUR MISUSE OR NEGLIGENT USE OF THE EQUIPMENT OR YOUR NEGLIGENT ACTS OR OMISSIONS OR (II) INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING COMMERCIAL LOSS, OR LOST PROFITS, DATA OR GOODWILL, FOR ANY MATTER RELATING TO THIS AGREEMENT.

## 3.    Default and Remedies

(a)    If you don't make any payment within three days after the due date shown on our invoice, you breach any other obligation under this Agreement or under any other agreement with Pitney Bowes and such breach continues for thirty days after we give you notice or you become insolvent or file for bankruptcy, you will be in default and we may:
    (i)    cancel this Agreement and any other agreements Pitney Bowes has with you;
    (ii)    require you to pay to us immediately all amounts payable under the Lease or other agreements, whether then due or payable in the future;
    (iii)    disable the Meter;
    (iv)    require you to return the Equipment, Meter and software;
    (v)    if you don't return the Equipment, require you to immediately pay to us an amount equal to the value of the Equipment, as determined by us;
    (vi)    charge you a late charge for each month that your payment is late;
    (vii)    charge you a check return fee for payments made by you with insufficient funds; and
    (viii)    pursue any other remedy, including repossessing the Equipment and Meter without notice to you.  To the extent permitted by law, you waive any notice of our repossession or disposition of the Equipment or Meter. By repossessing the Equipment or Meter, we aren't waiving our right to collect the balance due.
(b)    You agree to pay all our costs, including attorneys' fees, incurred in enforcing our rights.
(c)    We may suspend any services during any period that your account is more than thirty days past due.

## 4.    Taxes

You agree to pay us for all sales, use, property or other taxes (excluding taxes on net income) related to the Lease or rental agreement based on or measured by your payments, the Equipment, Equipment location, Meter and Meter location. We will determine the amount of all property and similar taxes to be charged to you based on our reasonable valuation of the Equipment or of the Meter, taking into consideration tax rates and depreciation. You agree to pay a tax administrative charge set by us without reference to the tax charged or services performed; such fee and charge won't exceed a total of $35 per year for each Lease schedule or rental agreement.

2

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

**5.      Embedded Software and Subscription Services**

(a)      Our Equipment may contain embedded software.  For embedded software, you agree that: (i) we and our licensors own the copyrights and other intellectual property to it; (ii) you are licensed only to use it with our Equipment in which it resides; (iii) you won't copy, modify, de-compile, or attempt to unbundle, reverse engineer or create derivative works of it, unless allowed by law; (iv) you won't distribute or disclose it (or any portion) to anyone; and (v) you won't export it in violation of export control laws.  The embedded software may contain third party software which is subject to any terms accompanying it.  Technical support for embedded software will be given according to the SLA covering the Equipment with the embedded software.

(b)      We may offer certain on-demand services to you on a subscription basis according to your Order.  Upon your payment of the subscription fees, we grant you a non-exclusive, non-transferable license to access and use the subscription services for the term set forth in the Order for your internal business purposes only.  You can't give access to the subscription services to anyone else, or use the subscription services on behalf of anyone else without our written consent.  You will comply with all laws, rules and regulations governing your use of the subscription services, including any data protection or privacy laws.  You won't use the services to send or store infringing, obscene, threatening or unlawful material or disrupt the use by others of the subscription services, network service or network equipment, and you won't reverse engineer, decompile or disassemble the subscription services. If the subscription services you purchased come with their own terms of use, your use will be covered by those terms.  Maintenance and technical support for any on-demand services will be provided under a separate agreement.

**6.      Internet Access Point**

The internet connectivity for the Equipment or Meter may use an internet access point provided by us.  You may only use this access point for connectivity between the Equipment or Meter and the internet and for no other purpose.  You agree to pay all costs resulting from the use of the access point in violation of this restriction.

**7.      Security Interest**

You grant us a purchase money security interest in the Equipment, any replacements, and any proceeds from the sale of the Equipment, to secure payment of any balance due.  We have the right to recover the Equipment if you haven't paid for it.  We may file a copy of this Agreement as a financing statement with the State authorities.  If you are leasing Equipment, you authorize us to file a Uniform Commercial Code financing statement naming you as debtor/lessee with respect to the Equipment in order to protect our interest in the Equipment.

**8.      Export Laws**

You agree: (i) to comply with all U.S. export control laws and regulations; (ii) not to export, re-export, or transfer any products and technologies received in an Order to any destination or to any person if prohibited by any U.S. law or regulation; and (iii) to immediately notify us in writing if you or one of your affiliates is or becomes listed in any Denied Parties List or if your or any of your affiliates export privileges are denied, suspended or revoked by any U.S. Government entity.

**9.      Analog Connectivity**

**IF YOU USE AN ANALOG CONNECTION FOR YOUR MAILING SYSTEM, YOU ACKNOWLEDGE THAT THE ANALOG CONNECTIVITY IS PROVIDED BY A THIRD PARTY SUPPLIER. NEITHER WE NOR OUR SUPPLIER PROVIDES ANY WARRANTY WITH RESPECT TO THE FUNCTIONALITY OR QUALITY OF THE ANALOG CONNECTION. IF THE THIRD PARTY SUPPLIER NO LONGER PROVIDES ANALOG CONNECTION CAPABILITY, WE WON'T BE RESPONSIBLE FOR PROCURING AN ALTERNATIVE SUPPLIER AND YOU WILL HAVE TO USE A DIGITAL CONNECTION.**

3

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

10.    **Miscellaneous**

(a)    You agree to use the Equipment and Meter only for business or commercial purposes, and not for personal, family, or household purposes.

(b)    Your use of any application will be subject to the terms of use provided at the time of your first login.

(c)    We aren't responsible for any delay or failure to perform resulting from causes outside of our control.

(d)    You may not assign this Agreement without our prior written consent.  Any assignment without our consent is void.

(e)    Payments aren't subject to setoff or reduction.

(f)    **ANY LEGAL ACTION YOU FILE AGAINST US MUST BE STARTED WITHIN ONE YEAR AFTER THE EVENT GIVING RISE TO YOUR CLAIM. YOU WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATED TO THIS AGREEMENT.**

(g)    We can only change this Agreement if we both agree to do so in writing. You may use a purchase order to offer to obtain equipment or services but none of its provisions will modify or supersede these provisions unless we expressly agree in writing.  If any provision in this Agreement is found to be invalid or unenforceable, the remaining provisions won't be affected.

(h)    Our respective rights and obligations under Sections 2 (Limitation of Liability), 3 (Default and Remedies) and 4 (Taxes) will survive termination of this Agreement.

(i)    We may deliver any notice and other communication to you under this Agreement by email to the email address that we have on file for you.  You agree to the delivery of these notices and other communications by email.  We may call you at any number you give to us.

(j)    This Agreement is governed by the laws of the State of Delaware.

(k)    You agree that we can use your name in a client list and identify you as a client when communicating with prospective clients, in each case along with our product or service that you are using.  You agree that we can use your name and logo in marketing content, including in an advertising campaign, with your prior consent.

## LEASE TERMS

11.    **Lease of Equipment; Provider of Leasing Services**

If you are leasing Equipment, these Lease Terms apply.  PBI is the manufacturer of the Equipment. Pitney Bowes Global Financial Services LLC, a wholly-owned subsidiary of PBI ("PBGFS"), provides you with the leasing services. The term of this Lease is the number of months stated on the order (the "**Lease Term**") and begins on the date the Equipment is shipped if we don't install the Equipment, and the date of installation if we install the Equipment. **You may not cancel this Lease for any reason and all payment obligations under this Lease are unconditional.** You understand that we own the Equipment.  PBI owns any Meter as USPS regulations require.  Except as stated in Section 13, you don't have the right to become the owner of the Equipment at the end of the Lease Term.

12.    **Payment Terms**

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

We will invoice you quarterly in advance for all payments on the Order, unless the Order says otherwise (each such payment is a "**Periodic Payment**"). You will make each Periodic Payment by the due date shown on our invoice. Your Periodic Payment may include a one-time origination fee, amounts carried over from a previous lease, software license and maintenance fees and other charges. Any Meter rental fees and SLA fees (collectively "**PBI Payments**") will be included with your Periodic Payment and begin with the start of the Lease Term. After the Lease Term, your Periodic Payment will increase if your PBI Payments increase.

**13.     End of Lease Options**

During the 90 days before your Lease ends, you may, unless you are in default: (i) enter into a new lease with us; (ii) purchase the Equipment "as is, where is" for its fair market value; or (iii) return the Equipment and Meter in their original condition, reasonable wear and tear excepted, and pay us our then applicable processing fee (including any equipment return fee). If you return the Equipment and Meter, you will, as specified by us, either properly pack and return them to us in the return box and with the shipping label provided by us or furnish them to a service carrier specified by us to pick up and ship them to us. If you don't do one of the things listed in clause (i), (ii) or (iii) above, you will be deemed to have agreed to enter into successive month to month extensions of the term of this Lease. You may choose to cancel the automatic extensions at any time by giving us 30 days' written notice. Upon cancellation, you agree to either return all items as provided in this Section 13 or purchase the Equipment.

**14.     WARRANTY AND LIMITATION OF LIABILITY**

**PBI PROVIDES YOU WITH THE LIMITED WARRANTIES IN SECTION 1. PBGFS MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FREEDOM FROM INTERFERENCE OR INFRINGEMENT, AND PBGFS ISN'T LIABLE FOR ANY LOSS, DAMAGE (INCLUDING INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES) OR EXPENSE CAUSED DIRECTLY OR INDIRECTLY BY THE EQUIPMENT.**

**15.     Equipment Obligations**

You will keep the Equipment free from liens and in good condition and working order. We may inspect the Equipment and related maintenance records. You may not move the Equipment from the location specified on the Order without our prior written consent.

**16.     Risk of Loss and ValueMAX®Program**

(a)     You bear the entire risk of loss to the Equipment from the date of shipment by us until the Equipment is returned to, and received by, us, regardless of cause, ordinary wear and tear excepted ("**Loss**"). No Loss will relieve you of any of your obligations under this Lease. You must immediately notify us in writing of any Loss. To protect the Equipment from loss, you will either: (i) keep the Equipment insured against Loss for its full replacement value under a comprehensive policy of insurance or other arrangement that is reasonably satisfactory to us ("**Insurance**"); or (ii) be enrolled in PBGFS' ValueMAX program described in paragraph (b) below.

(b)     YOU MUST CALL US AT 1-800-732-7222 OR GO TO www.pitneybowes.com/us/valuemaxoptout AND PROVIDE US WITH EVIDENCE OF INSURANCE IF YOU DO NOT WISH TO BE ENROLLED IN THE VALUEMAX PROGRAM. If you don't provide evidence of Insurance and haven't previously enrolled in our equipment replacement program (ValueMAX), we may  include the Equipment in the ValueMAX program and charge you a fee, which we will include as  an additional charge on your invoice. We will provide written notice reminding you of your Insurance obligations described in paragraph (a) above. If the Equipment is included in the ValueMAX program and any damage or destruction to the Equipment occurs (other than  from your gross negligence or willful misconduct, which is not covered by ValueMAX), we will (unless you are in default) repair or replace the Equipment. We aren't liable to you if we terminate the

5

FILED DATE: 4/23/2025 12:56 PM  2025CH04542

ValueMAX program.  By providing the ValueMAX program, we aren't offering or selling you insurance; accordingly, regulatory agencies haven't reviewed this Lease, this program or its associated fees, nor are they overseeing our financial condition.

**17.**    **Other Lease Terms**

(a)    If more than one lessee is named in this Lease, liability is joint and several. You, and any guarantor signing the Order or any documents executed in connection with this Lease, agree to furnish us financial information upon request.  Each of these persons authorizes us to obtain credit reports on them now and in the future.

(b)    You may not assign or sublet the Equipment, the Meter or this Agreement without our prior written  consent.  Any assignment without our consent is void.  We may sell or assign all or part of this Lease or the Equipment but it will not affect your rights or obligations.

(c)    We will provide you with a welcome letter by email.

**SERVICE LEVEL AGREEMENT**

**18.**    **Applicability of SLA**

This SLA section applies to you if we have entered into an agreement to provide service for any Equipment we lease, rent or sell on the Order, excluding any DI2000 (the covered equipment is called "**Covered Equipment**").

**19.**    **Service Level Options**

(a)    (i) If you sign up for **Standard SLA** on the Order, PBI will provide at its option either repair or replacement services for the Covered Equipment during the Initial Service Term or any Renewal Service Term (each term as defined in Section 20) (the "**Service Term**"). You are also entitled to: (x) replacement printheads for Covered Equipment without additional charge, except for printheads which need to be replaced as a result of any Excluded Circumstance; and (y) two preventative maintenance service calls per calendar year. PBI will notify you when preventative maintenance is due or you can request preventative maintenance service.  If your Covered Equipment needs repair, PBI may provide repair by remote access, diagnostics and service and/or by on-site repair service. Repair service is provided only for damage resulting from normal wear and tear.  Repair service may include the use of new, reconditioned, or remanufactured parts and assemblies. PBI will provide parts or assemblies for discontinued equipment (or equipment not marketed as new) only if available. If PBI deems it necessary, PBI will dispatch a service technician to arrive at your location for on-site service. You won't incur hourly charges unless service is performed outside Normal Working Hours, which will be done only with your consent. "**Normal Working Hours**" means 8 a.m. – 5 p.m., Monday – Friday, excluding PBI-observed U.S. holidays, in the time zone where the Equipment or other items are located.

(ii)  If PBI determines that replacement of Covered Equipment is necessary, PBI will, at no additional cost to you, promptly ship new, reconditioned, or remanufactured equipment of the same or a functionally equivalent model to replace the affected Covered Equipment. Unless PBI instructs you otherwise, within five days of receiving the replacement equipment, you must pack the Covered  Equipment to be replaced in the shipping carton that contained the replacement equipment, place the pre-paid return address label on the carton, and return it to PBI.  You are responsible for the Covered Equipment until PBI receives it.

(b)    If you are eligible to receive **Performance SLA** under our policies and you sign up for Performance SLA on the Order, you will be entitled to receive: (i) all coverage provided under Standard SLA; (ii) one two-hour application consultation for your mailing and shipping needs; and (iii) admission for one person to a PBI mail management seminar. If PBI determines that on-site service is necessary, PBI will use commercially reasonable efforts to have a service

6

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

technician on-site (during Normal Working Hours only) within 4 hours or 8 hours,  as specified on the Order, after PBI has determined that it can't resolve the issue remotely (the "**Response Time Commitment**"). The Response Time Commitment relates solely to the arrival of a technician at your location.  It isn't a guaranteed resolution of the problem within the Response Time Commitment period, and it doesn't guarantee that all parts necessary to make a repair will be on-site within this time frame.  The Response Time Commitment does not apply to Service designated as service by replacement, relocation services, software maintenance, preventative maintenance, operator training, or other  services not essential to repair the Covered Equipment. If the Covered Equipment is moved from its original location, PBI may, at its option, remove the Response Time Commitment.  If this happens, you will receive Standard SLA and we will adjust the SLA charges payable by you appropriately.  If we don't meet the Response Time Commitment, we will provide you with a credit equal to the difference between the cost of Standard SLA and Performance SLA for three months. In order to receive this credit, you must use a credit request form which you can obtain from your service technician or by calling the Customer Care Center.  The credits are limited to credits for four failures to meet the Response Time Commitment in  any twelve-month period during the Service Term. **These remedies are your sole remedy for PBI's failure to meet the Response Time Commitment.**

**20.**   **Service Term**

PBI will provide you with Service for twelve months, if you don't have a Lease, or for the Lease Term, if you are leasing Equipment (the "**Initial Service Term**"). **SERVICE AUTOMATICALLY RENEWS FOR CONSECUTIVE ONE YEAR TERMS (EACH A "RENEWAL SERVICE TERM") UNLESS YOU TERMINATE YOUR SERVICE AS PROVIDED BELOW OR THE LEASE EXPIRES OR IS TERMINATED OR THE RENEWAL IS PROHIBITED BY LAW.** If you don't wish to renew Service, you must deliver a written notice (the "**Termination Notice**") at least sixty days prior to the renewal of the term to us at 2225 American Drive, Neenah, WI 54956. Your Termination Notice must include your customer account number and lease number (if applicable). PBI reserves the right not to renew your SLA for any reason.

**21.**   **SLA Fees**

You will pay the SLA fees for the Initial Service Term and any Renewal Service Term(s). We may increase the SLA fees after the Initial Service Term, and any increases will be reflected on your invoice. If you receive service for repairs caused by any Excluded Circumstance, PBI will charge you for the service at PBI's current hourly rates and for any required parts.  If you exceed the cycle volume of your Equipment specified on the Order, PBI may bill you for the additional cycles over the specified cycle volume (the additional cycles are called the "Overage").  The charge will be determined by reference to the rate in effect at the time that we determine that an Overage exists.

**22.**   **Service Changes**

PBI may modify its Service by giving written notice to you (a "**Service Change Notice**"), which will state whether the change is material. After receiving a Service Change Notice, if the change is material, you may terminate Service by giving us a termination notice at the address indicated in Section 20.

**23.**   **Additional Service Terms**

You can't elect to have Service apply to some but not all of the items of Equipment. Service doesn't include services and repairs that are made necessary due to any Excluded Circumstance. Service excludes the supply of postal and carrier rate changes and Consumable Supplies. If you replace any of your Covered Equipment during the Service Term, and the replacement Equipment qualifies for Services, PBI will automatically enroll you for maintenance coverage on the new Equipment at PBI's then current annual rates. If you acquire an attachment, or add a unit, to your Covered Equipment, PBI will provide coverage for each attachment or unit which we determine qualifies for coverage under the SLA and adjust your rate accordingly. If you choose not to continue coverage on the replacement Equipment, attachment or unit, you may cancel Service for the item within thirty days of the date of your initial invoice for the item

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

from PBI.  If you cancel, any further maintenance or repair services on the Equipment, attachment or unit will be subject to PBI's current rates. Standard SLA will apply to rented Equipment at no additional charge.

**EQUIPMENT AND POSTAGE METER RENTAL TERMS**

**24.     Rental**

If you aren't leasing the Equipment and paying for it in your lease payment to PBGFS, we will invoice you the Equipment and Meter rental ("rental") fees listed on the Order. After the period listed on the Order (the "**Initial Term**"), we may increase the rental fees upon at least 30 days' prior written notice. When you receive notice of an increase, you may terminate your rental only as of the date the increase becomes effective. At the end of the Initial Term, the rental term will automatically renew for successive 12-month extensions.  If you don't wish to renew the rental term, you must deliver a written notice to us at least 60 days prior to the renewal of the rental term. Upon expiration of the term of the rental, you agree to return Equipment and Meters covered by the rental in their original condition, reasonable wear and tear excepted.

**25.     Postage**

You may transfer funds to The Pitney Bowes Bank, Inc. (the "Bank") for deposit into your Postage By Phone® Reserve Account that you maintain with the Bank (your "**Reserve Account**") or you may transfer funds to the United States Postal Service (the "**USPS**") through a lockbox bank (a "**Lockbox Bank**").  See the "USPS Acknowledgment of Deposit" below for more information. Until the end of the Initial Term, we may charge you a fee of up to $15.00 for refilling your postage.  After the Initial Term, we may increase postage refill fees upon 30 days prior written notice. If you participate in any PBI, PBGFS, or Bank postage advance programs (such as Purchase Power), we will advance payment on your behalf to the USPS, subject to repayment by you under the terms of the postage advance program and billed separately from your rental fees.

**26.     Meter Repair or Replacement; Meter Care and Risk of Loss**

If the Meter malfunctions or fails due to reasons other than an Excluded Circumstance, we will repair or replace the Meter. You agree to take proper care of the Meter(s), as stated in this Agreement and any user documentation.  You assume all risk of loss or damage to the Meter(s) while you have possession.

**27.     Terms of Use of Meter; Federal Regulations**

You may use the Meter solely for the purpose of processing your mail, provided that you are authorized by the USPS to use the Meter, and that you comply with (i) this Agreement, (ii) any operator guide and (iii) all USPS regulations. You agree to use only attachments or printing devices authorized by us. You must receive our written consent before moving the Equipment or Meter to a different location. Federal regulations require that we own the Meter. Tampering with or misusing the Meter is a violation of federal law. Activities of the USPS, including the payment of refunds for postage by the USPS to clients, will be made in accordance with the current Domestic Mail Manual. If the Meter is used in any unlawful scheme, or isn't used for any consecutive 12 month period, or if you take the Meter or allow the Meter to be taken outside the United States without proper written permission of USPS Headquarters, or if you otherwise fail to abide by the postal regulations and this Agreement regarding care and use of the Meter, then this Agreement and any related Meter rental may be revoked. You acknowledge that any use of this Meter that fraudulently deprives the USPS of revenue can cause you to be subject to civil and criminal penalties applicable to fraud and/or false claims against the United States. The submission of a false or fraudulent statement can result in imprisonment of up to 5 years and fines of up to $10,000 (18 U.S.C. 1001) and a civil penalty of up to $5,000 plus an assessment of twice the amount falsely claimed (3 U.S.C. 3802). The mailing of matter bearing a fraudulent postage meter imprint is an example of a violation of these statutes. You are responsible for immediately reporting (within 72 hours or less) the theft or loss of the Meter to us. Failure to comply with this notification provision in a timely manner may result in the denial of refund of

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

any funds remaining on the Meter at the time of loss or theft. You understand that the rules and regulations regarding the use of this Meter as documented in the Domestic Mail Manual may be updated from time to time by the USPS and it is your obligation to comply with any rules and regulations regarding its use.

### 28. Rate Updates and Soft-Guard® Program

Your Meter or Equipment may require periodic rate updates that you will obtain under our Soft-Guard program. Under the Soft-Guard program, we will provide up to 6 rate updates during each 12 month period following the date of installation of the Equipment. We will provide rate updates only if required due to a postal or carrier change in rate, service, ZIP Code™ or zone change. The Soft-Guard program doesn't cover any change in rates due to custom rate changes, new classes of carrier service, or a change in ZIP Code or zone due to equipment relocation. If you have received the maximum number of rate updates under the Soft-Guard program, you will be billed separately for any additional rate update we provide. We won't be responsible for any losses arising out of or resulting from the failure of rating or software downloads to conform to published rates.

### 29. Collection of Information

You authorize us to access and download information from your Meter. We may disclose this information to the USPS or other authorized governmental entity. We won't share with any third parties (except the USPS or other governmental entity) individually identifiable information that we obtain about you in this manner unless required to by law or court order. We may elect to share aggregate data about our clients' postage usage with third parties.

### 30. Value Based Services

Value based services are services the USPS provides, including e-Return Receipt and USPS Confirmation Services. Any fees the USPS charges for these services are your responsibility to pay for and are payable the same way that you pay for postage. The USPS is solely responsible for its services. We are not responsible for any malfunctions of any part of the communication link connecting the Meter with the USPS data system. We have the right to terminate the value based services if the USPS discontinues offering the service or you breach your obligations under this Agreement and fail to cure the breach within thirty days after you have been notified in writing.

## USPS ACKNOWLEDGEMENT OF DEPOSIT

### 31. Acknowledgement of Deposit

This section of the agreement provides you with the sections that the USPS requires we include in any agreement where we are renting a meter. The USPS requires that we use specific language. The "acknowledgement of deposit" terms are as follows:

(a)    In connection with your use of a Postage Evidencing System as defined in the Code of Federal Regulations ("**CFR**"), you may transfer funds to the USPS through a Lockbox Bank for the purpose of prepayment of postage on Postage Evidencing Systems, generating evidence of postage, both PC Postage and meters (a "**Deposit**"), or you may transfer funds to the Bank for deposit into your Reserve Account.

(b)    To the extent you deposit funds in advance of the use of any evidence of postage, you may make Deposits in the Lockbox Bank account identified as "United States Postal Service CMRS-PB" or make deposits in your Reserve Account, in either case through electronic means, including Automated Clearinghouse Transfers. The USPS may, at its discretion, designate itself or a successor as recipient of Deposits made by you to the Lockbox Bank account described above.

(c)    Any deposit made by you in your Reserve Account is subject to the Postage By Phone® Reserve Account – Agreement and Disclosure Statement governing your Reserve Account.

9

©2017 Pitney Bowes Inc. All rights reserved. Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

(d)     Any Deposit made by you in the Lockbox Bank account shall be credited by the USPS only for the payment of evidence of postage.  Such Deposits may be commingled with Deposits of other clients.  You shall not receive or be entitled to any interest or other income earned on such Deposits.

(e)     The USPS will provide a refund to you for the remaining account balances of Deposits held by the USPS.  These refunds are provided in accordance with the rules and regulations governing deposit of funds for evidence of postage, published in the CFR.

(f)     The Lockbox Bank, which shall collect funds on behalf of the USPS, shall provide PBI, on each business day, information as to the amount of each Deposit made to the USPS by you, so that PBI can update its records.

(g)     PBI may deposit funds on your behalf.  The USPS will make no advances of funds to you.  Any relationship concerning advances of funds is between you and PBI, PBGFS and/or the Bank.

(h)     You acknowledge that the terms of this Acknowledgement may be changed, modified, or revoked by the USPS, with appropriate notice.

(i)     Postal Regulations governing the deposit of funds are published in the CFR or its successor.  You acknowledge that you shall be subject to all applicable rules, regulations, and orders of the USPS, including future changes to such rules, regulations, and orders, and such additional terms and conditions as may be determined in accordance with applicable law.  The USPS rules, regulations, and orders shall prevail in the event of any conflict with any other terms and conditions applicable to any Deposit.

## PURCHASE POWER TERMS

### 32.     Purchase Power Program

(a)     The Purchase Power credit line is a product of the Bank and is not available to individuals for personal, family, or household purposes. In order to participate in the Purchase Power program (the "**Program**"), you must provide the information described in paragraph (h) below. You will receive a set of more specific provisions for the Program within thirty days of the date of this Agreement.

(b)     Your Purchase Power account (the "**Account**") will be charged for the amount of postage, products, and services requested and the related fees, if applicable. Unless prohibited by law, you agree to pay the fees and charges of which the Bank has given you notice, including those relating to: (i) applicable transaction or overage fees; (ii) your failure to pay in a timely manner; (iii) your exceeding your credit line; and (iv) fees attributable to the return of any checks.

(c)     You will receive a billing statement for each billing cycle in which you have activity in the Account. The Bank may deliver any statement electronically to the email address that is on file for you. Payments are due by the due date shown on your billing statement. You may pay the entire balance due or a portion of the balance, provided that you pay at least the minimum payment shown on the statement. In the event of a partial payment, you will be responsible for the unpaid balance.

(d)     (i) By using the Program, you agree that whenever there is an unpaid balance outstanding on the Account which is not paid in full by the due date shown on your billing statement, the Bank will charge you, and you will pay, interest on the unpaid balance of the Account from time to time, for each day from the date the transaction is posted to the Account until the date the unpaid balance is paid in full, at a variable rate equal to the Annual Percentage Rate applicable to the Account from time to time. (ii) The Annual Percentage Rate applicable to the Account will be: the greater of (x) 22% and (y) the sum of the highest "Prime Rate" published in the "Money Rates" section of *The Wall Street Journal* on the last business day of the month and the margin set forth below (the sum of the margin and the Prime Rate is herein called the "Floating Rate"). The Annual Percentage Rate will be adjusted on a monthly basis based

10

©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

on any fluctuation in the Floating Rate, if applicable. Any change in the Annual Percentage Rate based on the calculation described in this section will become effective on the first day of your next billing cycle. (iii) The margin which will be added to the Prime Rate to determine the Floating Rate will be 14.75% (using the Prime Rate in effect as of March 31, 2017, the daily periodic rate would be .05137% and the corresponding annual percentage rate would be 18.75%). (iv) The Account balance that is subject to a finance charge each day will include (x) outstanding balances, minus any payments and credits received by the Bank on the Account that day, and (y) unpaid interest, fees, and other charges on the Account. (v) The Bank will charge a minimum finance charge of $1.00 in any billing cycle if the finance charge as calculated above is less than $1.00. (vi) Each payment that you make will be applied to reduce the outstanding balance of the Account and replenish your available credit line. (vii) The Bank may refuse to extend further credit if the amount of a requested charge plus your existing balance exceeds your credit limit.

(e)      The Bank may at any time close or suspend the Account, and may refuse to allow further charges to the Account. Cancellation or suspension will not affect your obligation to pay any amounts you owe.

(f)      The Bank can amend any of the provisions and terms related to the Program at any time by written notice to you (including by electronic notice via the email address that is then on file for you). You are consenting to electronic delivery of any amendments to the Program terms.  Each time you use the Program, you are signifying your acceptance of the terms then in effect. An amendment becomes effective on the date stated in the notice and will apply to any outstanding balance on the Account. The Bank may terminate the Program at any time and will notify you in the event of any termination. Any outstanding obligation will survive termination of the Program.

(g)      The Program and any advances are governed by and construed in accordance with the laws of the State of Utah and applicable federal law.

(h)      USA PATRIOT Act - To help the government fight the funding of terrorism and money laundering activities, Federal law requires financial institutions to obtain, verify and record information that identifies each person who opens an account. Accordingly, in order to activate the Account, the Bank asks that you agree to provide identifying information, including your address and taxpayer identification number. The Bank may also ask for additional identifying information, where appropriate, including asking that your representative who is opening the Account provide his/her name, address, date of birth, driver's license and/or other documents and information that will allow the Bank to identify him/her.  You agree to provide all such requested identifying information.

## PRODUCT SPECIFIC TERMS

### 33.     PBSmartPostageTerms of Use
If you have ordered pbSmartPostage, your use of that product will be subject to the Terms of Use which are available at pitneybowes.com/us/license-terms-of-use/smart-postage-terms-and-conditions.html and are incorporated by reference.  Your use of pbSmartPostage is entirely governed by the pbSmartPostage Terms of Use and any other provisions of these Pitney Bowes Terms will not apply to your use.

### 34.     Relay™ Communications HubTerms
If you have ordered services under the Relay Communications Hub, your use of those services will be subject to the Relay Communications Hub Terms which are available at pitneybowes.com/us/license-terms-of-use/relay and are incorporated by reference.  Your use of services under the Relay Communications Hub is entirely governed by the Relay Communications Hub Terms and any provisions of these Pitney Bowes Terms will not apply.

### 35.     SendPro Terms
If you are acquiring a SendPro subscription: (i) without any SendKit equipment, your use of the product will be subject to the Terms of Use which are available at pitneybowes.com/us/license-terms-of-use/sendpro-subscription.html; and (ii) with any SendKit equipment, your use of the product will be subject to Terms Of Use which are available at pitneybowes.com/us/license-terms-of-use/sendpro-term.html.  The applicable Terms of Use are incorporated by reference.

11

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

Your use of the SendPro application is entirely governed by the SendPro Terms of Use and any other provisions of these Pitney Bowes Terms will not apply to your use.

**36.     DI2000 Inserting System Terms**
Certain provisions which apply when you purchase, lease or rent a DI2000 inserting system and when you purchase a service plan for it are set forth at pitneybowes.com/us/di2000-terms.html and are incorporated by reference.  Those provisions govern to the extent that they are inconsistent with the other terms of this Agreement.

**37.     PBBackup and PC-Backup Service Terms**
Certain provisions which apply when you utilize the PBBackup or PC-Backup services are set forth at pitneybowes.com/us/pbbackup-service-and-pcbackup-service-terms.html and are incorporated by reference.

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/25/2025 10:55 AM   2025CH04542

| ClientCaseID: | 78 | 79641 | CaseReturnDate: | 4/24/25 |

Affidavit of A PRIVATE INVESTIGATOR

FILED
4/25/2025 10:55 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04542
Calendar, 5
32438174

## COOK COUNTY STATE OF ILLINOIS, CIRCUIT COURT

Case Number **2025CH04542**

I, JOHN PENNELL

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND LICENSED AS A PRIVATE DETECTIVE (LICENSE # 115.002074) UNDER THE PRIVATE DETECTIVE ACT OF 2004.

### CORPORATE SERVICE

THAT I SERVED THE WITHIN   SUMMONS & COMPLAINT
ON THE WITHIN NAMED DEFENDANT  PITNEY BOWES, INC.
PERSON SERVED LYLE NEEMAN, AUTHORIZED AGENT
BY LEAVING A COPY OF EACH WITH THE SAID DEFENDANT ON **4/24/25**

78 X .25 = 15.75

That the sex, race and approximate age of the whom I left the   SUMMONS & COMPLAINT
are as follow:

| Sex | MALE | Race | WHITE | Age | 75 | Height | 5'3" | Build | 135# | Hair | GRAY |

LOCATION OF SERVICE   **801  ADLAI STEVENSON DR.
SPRINGFIELD, IL, 62703**

Date Of Service   **4/24/25**   Time of Service   **1:15 PM**

JOHN  PENNELL                              4/24/2025
**A PRIVATE INVESTIGATOR**
PRIVATE DECTECTIVE # 115.002074

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

State of ILLINOIS  County of SANGAMON
Signed and sworn (or affirmed) to before
me on 4/24/2025   (date) by

(name/s of person/s making statement).
(Seal)        OFFICIAL SEAL (Notary Public Signature)
**RACHEL ELIZABETH PENNELL
Notary Public, State of Illinois
Commission No. 997692
My Commission Expires Sept. 30, 2028**

FILED
4/23/2025 12:56 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04542
Calendar, 5
32398185

Hearing Date: 7/3/2025 9:30 AM
Location: Court Room 2308
Judge: Cohen, Neil H

FILED DATE: 4/23/2025 12:56 PM 2025CH04542

| | | |
|---|---|---|
| **2120 - Served** | **2121 - Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

SCHRAMM LAW GROUP, LLC
on behalf of Plaintiff and a class,

Plaintiff(s)

v.

PITNEY BOWES INC.,

Defendant(s)

Case No. ___2025CH04542___

Pitney Bowes Inc.,
 c/o Illinois Corporation Service Company,
801 Adlai Stevenson Drive,
Springfield, IL 62703-4261

Address of Defendant(s)

Please serve as follows (check one): ○ Certified Mail ○ Sheriff Service ◉ Process Server

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE**. You will need: a computer with internet access; an email address; a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/ appearance.asp; and a credit card to pay any required fees.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons** (12/01/20) CCG 0001 B

FILED DATE: 4/23/2025 12:56 PM  2025CH04642

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www. illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERK'S OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

---

⊙ Atty. No.: 41106

○ Pro Se 99500

Name: Daniel A. Edelman

Atty. for (if applicable):

Plaintiff

Address: 20 S. Clark St., Ste. 1800

City: Chicago

State: IL   Zip: 60603

Telephone: (312) 739-4200

Primary Email: courtecl@edcombs.com

Witness date _____

_4/23/2025 12:56 PM Mariyana T. Spyropoulos_

MARIYANA T. SPYROPOULOS, Clerk of Court

☐ Service by Certified Mail: _____

☐ Date of Service: _____
    (To be inserted by officer on copy left with employer or other person)

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED DATE: 4/25/2025 10:56 PM   2025CH04542

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:**  CivCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:**  CntyCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
          OR
      ChildSupCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:**  DVCourtDate@cookcountycourt.com
Gen. Info:   (312) 325-9500

### LAW DIVISION
**Court date EMAIL:**  LawCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:**  ProbCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info:   (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info:   (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info:   (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info:   (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info:   (708) 232-4551

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Atty. No. 41106

FILED
4/23/2025 12:56 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04542
Calendar, 5
32398185

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

SCHRAMM LAW GROUP, LLC,
on behalf of Plaintiff and the class
members described herein,

        Plaintiff,

    vs.

PITNEY BOWES INC.,

        Defendant.

2025CH04542

## <u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>

Plaintiff, Schramm Law Group, LLC, respectfully requests that the Court order that this

action may proceed on behalf of a class against Defendant Pitney Bowes Inc.

For purposes of Counts I and II, alleging violation of the Illinois Consumer Fraud Act, 815

ILCS 505/2, Plaintiff defines a class of (a) all persons with Illinois addresses (b) who leased a

postage machine from Defendant (c) which lease was outstanding at any time during the three years

prior to the filing of this action.

For purposes of Counts III, alleging violation of the duty of good faith and fair dealing,

Count IV, alleging unjust enrichment, Count V, alleging trespass to chattels, and Count VI, alleging

conversion, Plaintiff defines a class of (a) all persons (b) who leased a postage machine from

Defendant (c) which lease was outstanding at any time during the five years  prior to the filing of

this action.

Plaintiff is required to file a motion for class certification with the Complaint*, Ballard RN

Center, Inc. v. Kohll's Pharmacy and Homecare, Inc.,* 2015 IL 118644, 48 N.E.3d 1060, and may request

leave to supplement it later.

In support of this motion, Plaintiff states:

1

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

## NATURE OF THE CASE

1.      Plaintiff Schramm Law Group, LLC   is a law firm organized as an Illinois limited liability company.

2.      Defendant Pitney Bowes Inc. is a Delaware corporation that does business in Illinois.  Defendant manufactures and sells mailing and postage machines, as well as replacement ink cartridges for its machines.

3.      Plaintiff leased a Mailstation2 postage machine from Defendant beginning August 25, 2017.  The lease agreement is in Appendix A.  The terms and conditions referred to in the lease agreement are in Appendix B.

4.      Originally, the machine would display low ink warning but continue operating. However, during the last three years prior to the filing of this action, the machine would display a low ink warning and  stop operating.

5.      Pitney Bowes programmed the chip in the ink cartridge to interact with the machine to cause the machine to stop operating when it displayed a low ink warning.   The ink cartridge would not in fact be out of ink when the low ink warning was displayed.

6.      Pitney Bowes, without any specific request, would regularly send ink cartridges, charging Plaintiff's credit card, which Pitney Bowes had on file.  On information and belief, the chip also triggered the sending of ink cartridges.

7.      When the machines stop working because of "empty" ink cartridges, a significant amount of ink actually remains in the cartridges.

8.      Purchasers of ink cartridges have a reasonable expectation, when buying ink cartridges, that they have bought all the ink in the cartridge.

9.      Purchasers will continue using cartridges until they can tell by degraded print quality that ink is in fact running out.

10.      Pitney Bowes programmed the  chip in its cartridges to cause the machine to display a low ink warning and stop operating when the ink cartridge had ample ink to continue operating.

2

11.     Pitney Bowes did this to increase its profits by forcing lessees of its machines to purchase more ink from it.

12.     Pitney Bowes did not disclose that the replacement cartridges had been programmed to cause the machine to stop operating prematurely.

13.     Lessees, including Plaintiff, were financially injured when their machines ceased operating as a result of premature warnings of ink depletion and cartridge expiration and when they are caused to purchase new cartridges before the old ones have really run out of ink.

14.     Initially, Plaintiff replaced its ink cartridges early, unknowingly throwing away  excess toner.

15.     Plaintiff and other members of the class were damaged.

## REQUIREMENTS FOR CLASS CERTIFICATION

16.     Section 2-801 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-801,  states:

Prerequisites for the maintenance of a class action.

An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:

(1)     The class is so numerous that joinder of all members is impracticable.

(2)     There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3)     The representative parties will fairly and adequately protect the interest of the class.

(4)     The class action is an appropriate method for the fair and efficient adjudication of the controversy.

Although the statute was modeled after Rule 23 of the Federal Rule of Civil Procedure, some differences exist between the two. *Eshaghi v. Hanley Dawson Cadillac Co.,* 214 Ill. App. 3d 995, 999, 574 N.E.2d 760, 762 (1st Dist. 1991).

17.     The class action determination is to be made as soon as practicable after the commencement of an action brought as a class action and before any consideration of the merits. 735 ILCS 5/2-802.  The circuit court has discretion as to whether an action may proceed as a class action.  *Haywood v. Superior Bank,* 244 Ill. App. 3d 326, 328, 614 N.E.2d 461, 463 (1st Dist. 1993)

3

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

(overturning the lower court's denial of class certification in a landlord-tenant case).

18.   Class actions are essential to enforce laws protecting consumers.  As the court stated in *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill.App.3d 995, 574 N.E.2d 760 (1st Dist. 1991):

> In a large and impersonal society, class actions are often the last barricade of consumer protection. . . . To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups.  The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting.  The alternatives to the class action  --  private suits or governmental actions -- have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly effective.  The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer. (574 N.E.2d at 764, 766)

19.   As demonstrated below, each of the requirements for class certification is met.

### Numerosity

20.   Section 2-801(1) parallels the language of Federal Rule of Civil Procedure 23(a)(1); therefore, federal case law is instructive on the numerosity requirements under the Illinois Rules. *Wood River Area Dev. Corp. v. Germania Fed. Sav. & Loan Ass'n*, 198 Ill. App. 3d 445, 450, 555 N.E.2d 1150, 1153 (5th Dist. 1990).  The numerosity requirement is satisfied if it is reasonable to conclude that the number of members of the proposed class is greater than the minimum number required for class certification, which is about 10-40.  *Kulins v. Malco*, 121 Ill. App. 3d 520, 530, 459 N.E.2d 1038 (1st Dist. 1984) (19 and 47 members sufficient); *Swanson v. American Consumer Industries*, 415 F.2d 1326, 1333 (7th Cir. 1969) (40 class members sufficient); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill. 1986) (10-29 members sufficient).

21.   Illinois case law further indicates that "[t]he number of class members is relevant, not determinative." *Wood River Area Dev. Corp.,* 198 Ill. App. 3d at 450, 555 N.E. 2d at 1153.  Where the class size is smaller, other factors may come into play to demonstrate that joinder is impractical, including: (1) geographical spread of class members, (2) ease of identifying and locating class members, (3) the knowledge and sophistication of class members and their need for protection, (4) the size of class members' claims, and (5) the nature of the case.  *Id.* at 450-51, 555 N.E. 2d at 1153-54.

4

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

22.     It is not necessary that the precise number of class members be known: "A class action may proceed upon estimates as to the size of the proposed class." *In re Alcoholic Beverages Lit.,* 95 F.R.D. 321 (E.D.N.Y. 1982); *Lewis v. Gross,* 663 F.Supp. 1164, 1169 (E.D.N.Y. 1986).   The Court may "make common sense assumptions in order to find support for numerosity." *Evans v. United States Pipe & Foundry,* 696 F.2d 925, 930 (11th Cir. 1983).  "The court may assume sufficient numerousness where reasonable to do so in absence of a contrary showing by defendant, since discovery is not essential to most cases in order to reach a class determination. . . . Where the exact size of the class is unknown, but it is general knowledge or common sense that it is large, the court will take judicial notice of this fact and will assume joinder is impracticable." 2 *Newberg on Class Actions* (3d ed. 1995), §7.22.

23.     In the present case, Plaintiff alleges, based on the volume of Defendant's business and the use of standard practices,  that there are more than 40 class members,  making them so numerous that joinder is impracticable.

24.     While discovery will be needed to determine the precise class size, it is reasonable to infer that numerosity is satisfied.   *Wood River Area Dev. Corp.,* 198 Ill. App. 3d at 450, 555 N.E.2d at 1153 (concurring with a leading scholar's assertion that a class size of 40 clearly satisfies numerosity and that a class size of 25 likely satisfies numerosity); *Swiggett v. Watson,* 441 F.Supp. 254, 256 (D.Del. 1977) (an action challenging transfers of title pursuant to Delaware motor vehicle repairer's lien, the fact the Department of Motor Vehicles issued printed forms for such transfer was in of itself sufficient to show that the numerosity requirement was satisfied); *Westcott v. Califano,* 460 F. Supp. 737, 744 (D.Mass. 1978) (in action challenging certain welfare policies, existence of policies and 148 families who were denied benefits to which policies applied sufficient to show numerosity, even though it was impossible to identify which of 148 families were denied benefits because of policies complained of).

5

FILED DATE: 4/23/2025 12:56 PM    2025CH04642

**Common Questions and Predominance**

25.     A common question may be shown when the claims of the individual members of the class are based on the common application of a statute or they were aggrieved by the same or similar misconduct. *McCarthy v. La Salle Nat'l Bank & Trust Co.,* 230 Ill. App. 3d 628, 634, 595 N.E.2d 149, 153 (1st Dist.1992).

26.     In the present case, the predominant common questions include:

a.     Whether Defendant Pitney Bowes programmed the chip in the ink cartridge to cause the postage machine to display a low ink warning and to stop operating when the cartridge had ample ink to continue operating.

b.     Whether Defendant Pitney Bowes disclosed this to lessees of its postage machines;

c.     Whether Defendant's practices are unfair.

d.     Whether Defendant's practices are deceptive.

e.     Whether Defendant's conduct violates the duty of good faith and fair dealing.

f.     Whether Defendant's practices are inequitable, such as to result in unjust enrichment.

g.     Whether Defendant's practices amount to trespass to chattels.

h.     Whether Defendant's practices result in conversion of ink owned and possessed by Plaintiff.

27.     Where a case involves "standardized conduct of the defendants toward members of the proposed class, a common nucleus of operative facts is typically presented, and the commonality requirement . . . is usually met." *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D. Ill. 1984).

28.     The only individual issue is the identification of the class members, a matter easily ascertainable from the files of Defendant.

29.      Questions readily answerable from a party's files do not present an obstacle to class

6

FILED DATE: 4/23/2025 12:56 PM    2025CH04642

certification.  *Heastie v. Community Bank*, 125 F.R.D. 669 (N.D.Ill. 1989) (court found that common issues predominated where individual questions of injury and damages could be determined by "merely comparing the contract between the consumer and the contractor with the contract between the consumer and Community Bank").

**Adequacy of Representation**

30.    The class action statute requires that the class representative provide fair and adequate protection for the interests of the class.  That protection involves two factors:  (a) the attorney for the class must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the representative must not have interests antagonistic to those of the class. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992).

31.    Plaintiff understands the obligations of a class representative, and has retained experienced counsel, as is indicated by Appendix C, which sets forth counsel's qualifications.

32.    There are no conflicts between Plaintiff and the class members.

**Appropriateness of Class Action**

33.    Efficiency is the primary focus in determining whether the class action is an appropriate method for resolving the controversy presented.  *Eovaldi v. First Nat'l Bank,* 57 F.R.D. 545 (N.D.Ill. 1972).  It is proper for a court, in deciding this issue, to consider the ". . . inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually."  *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 (7th Cir. 1974).

34.    In this case there is no better method available for the adjudication of the claims which might be brought by each individual class member.  The class members are largely small businesses.  Most are probably unaware that their rights are being violated.  In addition, the modest size of the claims makes it unlikely that class members would be able to pay to retain counsel to protect their rights on an individual basis.

35.    The special efficacy of the consumer class action has been noted by the courts and is

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

applicable to this case:

> A class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied . . . .

*In re Folding Carton Antitrust Lit.*, 75 F.R.D. 727, 732 (N.D.Ill. 1977) (citations omitted).) Another

court noted:

> Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action. As Professors Wright, Miller and Kane have discussed, in analyzing consumer protection class actions such as the instant one, 'typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis. These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly situated.' 7B Wright et al., §1778, at 59; see e.g., *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) ('Class actions...may permit the plaintiff to pool claims which would be uneconomical to litigate individually.') The public interest in seeing that the rights of consumers are vindicated favors the disposition of the instant claims in a class action form.

*Lake v. First Nationwide Bank*, 156 F.R.D. 615 at 628, 629 (E.D.Pa 1994).

## **CONCLUSION**

36.    The Court should certify this action as a class action.


Respectfully submitted,


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Madeline Brashear
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
Dedelman@edcombs.com
tgoodwin@edcombs.com
mbrashear@edcombs.com
Atty. No. 41106 (Cook)

T:\41577\Pleading\Plaintiff's Motion for class certification_Pleading.WPD

8

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Edelman, certify that I had a copy of this document placed for service with the complaint.


<u>*/s/Daniel A. Edelman*</u>
Daniel A. Edelman

9

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

# **APPENDIX A**

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

**pitney bowes**

## Lease Agreement

Agreement Number

### Your Business Information

Full Legal Name of Lessee / DBA Name of Lessee

SCHRAMM LAW GROUP

Tax ID # (FEIN/TIN)

**Sold-To: Address**

| Sold-To: Contact Name | Sold-To: Contact Phone # | Sold-To: Account # |
|---|---|---|
| Adam Schramm | | |

**Bill-To: Address**

| Bill-To: Contact Name | Bill-To: Contact Phone # | Bill-To: Account # | Bill-To: Email |
|---|---|---|---|
| Adam Schramm | | | |

**Ship-To: Address**

| Ship-To: Contact Name | Ship-To: Contact Phone # | Ship-To: Account # |
|---|---|---|
| Adam Schramm | | |

**PO #**

### Your Business Needs

| Qty | Item | Business Solution Description |
|---|---|---|
| 1 | MAILSTATION | Mailstation2 |
| 1 | K7M0 | K7M0 - Mailstation2 Meter |
| 1 | K7SA | K7SA Profession Install - Mailstation2 |
| 1 | M0L2 | Mailstation2 with 2lb Scale and 10 Accts |
| 1 | PB-4000-US | SmartLink: LVM WiFi/LAN analytics device |
| 1 | SJK7 | SoftGuard for Mailstation2 |
| 1 | STDSLA | Standard SLA-Equipment Service Agreement (for Mailstation2) |

### Your Payment Plan

| Initial Term:  36 months | Initial Payment Amount: | |
|---|---|---|
| **Number of Months** | **Monthly Amount** | **Billed Quarterly at\*** |
| 36 | $ 24.00 | $ 72.00 |

*Does not include any applicable sales, use, or property taxes which will be billed separately.*

( ) Tax Exempt Certificate Attached
( ) Tax Exempt Certificate Not Required

(X) Purchase Power® transaction fees included
( ) Purchase Power® transaction fees extra

US154404.5    07/17
©2017 Pitney Bowes Inc. All rights reserved.
Doc ID: 20170825103313524
Sertifi Electronic Signature

Page 1 of 2

Y100726976
See Pitney Bowes Terms for additional terms and conditions

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

**Your Signature Below** ▬▬▬▬

By signing below, you agree to be bound by all the terms of this Agreement including the Pitney Bowes Terms (Version 7/17), which are available at http://www.pb.com/termsconditions and are incorporated by reference. You acknowledge that you may not cancel the lease for any reason and that all payment obligations are unconditional. The lease will be binding on us after we have completed our credit and documentation approval process and have signed below. The lease requires you either to provide proof of insurance or participate in the ValueMAX® equipment protection program (see Section 16 of the Pitney Bowes Terms) for an additional fee. If software is included in the Order, additional terms apply which are available by clicking on the hyperlink for that software located at http://www.pitneybowes.com/us/license-terms-of-use/software-and-subscription-terms-and-conditions.html. Those additional terms are incorporated by reference.

| E-Signed : 08/25/2017 11:35 AM EDT |
| --- |
| ▆▆▆▆▆▆▆▆▆▆▆ |
| Title: Owner |
| IP: ▆▆▆▆▆▆▆ |
| Sertifi Electronic Signature |
| DoctID: 20170825103313524 |

| Lessee Signature | Pitney Bowes Signature |
| --- | --- |
| Print Name | Print Name |
| Title | Title |
| Date | Date |
| Email Address | |

**Sales Information** ▬▬▬▬

| Tonya Ward | tonya.ward@pb.com |
| --- | --- |
| Account Rep Name | Email Address |

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

**Your Signature Below**

By signing below, you agree to be bound by all the terms of this Agreement including the Pitney Bowes Terms (Version 7/17), which are available at http://www.pb.com/termsconditions and are incorporated by reference. You acknowledge that you may not cancel the lease for any reason and that all payment obligations are unconditional. The lease will be binding on us after we have completed our credit and documentation approval process and have signed below. The lease requires you either to provide proof of insurance or participate in the ValueMAX® equipment protection program (see Section 16 of the Pitney Bowes Terms) for an additional fee. If software is included in the Order, additional terms apply which are available by clicking on the hyperlink for that software located at http://www.pitneybowes.com/us/license-terms-of-use/software-and-subscription-terms-and-conditions.html. Those additional terms are incorporated by reference.

E-Signed : 08/25/2017 11:35 AM EDT

Title: Owner
IP:                    Sertifi Electronic Signature
                       DocID: 20170825103313524

| | |
|---|---|
| Lessee Signature | Pitney Bowes Signature |
| Print Name | Print Name |
| Title | Title |
| Date | Date |
| Email Address | |

**Sales Information**

Tonya Ward                          tonya.ward@pb.com

Account Rep Name                    Email Address

©2017 Pitney Bowes Inc. All rights reserved.
Doc ID: 20170825103313524
Sertifi Electronic Signature                                    See Pitney Bowes Terms for additional terms and conditions

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

# **APPENDIX B**

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

## PITNEY BOWES TERMS

Thank you for choosing Pitney Bowes products and services.  Please read these Terms carefully. These Terms and the executed order (the "**Order**") make up your agreement with Pitney Bowes (this "Agreement").

Let's start with a few definitions that should help you better understand your agreement. "**PBI**" means Pitney Bowes Inc.  "**Pitney Bowes**" means PBI and its subsidiaries. "**We**", "**our**" or "**us**" refers to the Pitney Bowes companies with whom you've entered into the Order. "**You**" or "**your**" refers to the entity identified on the Order. "**Meter**" means any postage meter supplied by PBI under the Order, including (i) in the case of a Connect+®, a SendPro® P series or a SendPro C series mailing system, the postal security device, the application platform or tablet interface, the system controller and the print engine and (ii) in the case of all other mailing systems, the postal security device, the user interface or keyboard and display and the print engine. "**Equipment**" means the equipment listed on the Order, excluding any Meter, standalone software, and SendKit equipment, which is provided in connection with a subscription for the SendPro service. "**Lease**" means Lease terms and conditions set out in Sections 11 through 17.

The provisions included in these Terms consist of: (i) General Terms; (ii) Lease Terms; (iii) a Service Level Agreement; (iv) Equipment and Postage Meter Rental Terms; (v) an Acknowledgement of Deposit required by the United States Postal Service in any transaction involving a Meter; (vi) Purchase Power® Terms for a limited purpose credit line that may be available to you; and (vii) provisions relating to specific products.

## GENERAL TERMS

### 1.    Warranties

We warrant that all PBI-branded equipment ("**PBI Equipment**") will be free from defects in material and workmanship and will perform according to the operator guides for a period of ninety days from the date (i) the PBI Equipment is installed at your location when PBI installs the PBI Equipment for you or (ii) the PBI Equipment is delivered to you when you can install it yourself.  The DI2000™ inserting system has its own unique warranty that you can see at pitneybowes.com/us/di2000-terms.html.

(a)    A defect doesn't include the failure of rates within a rate update to conform to published rates.

(b)    We warrant that any service ("**Service**") we perform under the Service Level Agreement set out in Sections 18 through 23 (the "**SLA**") will be performed in a professional and workmanlike manner.

(c)    **Your sole remedy for a warranty claim is to have us repair or replace the PBI Equipment or, in the case of defective Service, reperform the Service.**

(d)    There is no warranty for PBI Equipment that needs to be repaired or replaced because of any Excluded Circumstance. "**Excluded Circumstances**" are circumstances outside of PBI's control, including an accident, your negligent or reckless use of the equipment, use of the equipment which exceeds our recommendations or in a way not authorized by this Agreement or any operator guide, use of the equipment in an environment with unsuitable humidity, line voltage, damage in transit, software virus, loss of data, loss or fluctuation of power, fire, flood or other natural causes, and other external forces beyond our control.  The warranty also does not apply if someone other than us services the equipment, you don't use required software updates, you use the equipment with any system where we have told you that we will no longer provide support or that we have advised you is no longer compatible, or you use third party supplies (such as ink), hardware or software that results in (i) damage to equipment (including damage to printheads), (ii) poor indicia, text or image print quality, (iii) indicia readability failures or (iv) a failure to print indicia, text or images.

1

FILED DATE: 4/23/2025 12:56 PM 2025CH04542

(e)    The print engine(s), print engine components, structural components and printed circuit board assemblies supplied with the PBI Equipment may be reclaimed, reconditioned or remanufactured. These items are warranted to perform according to the same standards as the equivalent new item.

(f)    The warranty doesn't cover ink, ink rollers, toner and drum cartridges, ribbons and similar items ("**Consumable Supplies**").

(g)    **EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, WE (ON BEHALF OF OURSELF AND OUR SUPPLIERS) MAKE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO THE EQUIPMENT OR SERVICES. WE MAKE NO REPRESENTATION OR WARRANTY AS TO ANY THIRD PARTY EQUIPMENT. WE AGREE TO PASS THROUGH TO YOU ALL THIRD PARTY EQUIPMENT WARRANTIES TO THE EXTENT PERMITTED.**

## 2.    Limitation of Liability

**OUR TOTAL LIABILITY (INCLUDING ANY LIABILITY OF OUR SUPPLIERS) IS LIMITED TO THE FEES PAID BY YOU FOR THE APPLICABLE EQUIPMENT OR SERVICES. NEITHER WE NOR OUR SUPPLIERS IS LIABLE FOR ANY:** (I) DAMAGE YOU MAY INCUR BY REASON OF YOUR MISUSE OR NEGLIGENT USE OF THE EQUIPMENT OR YOUR NEGLIGENT ACTS OR OMISSIONS OR (II) INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING COMMERCIAL LOSS, OR LOST PROFITS, DATA OR GOODWILL, FOR ANY MATTER RELATING TO THIS AGREEMENT.

## 3.    Default and Remedies

(a)    If you don't make any payment within three days after the due date shown on our invoice, you breach any other obligation under this Agreement or under any other agreement with Pitney Bowes and such breach continues for thirty days after we give you notice or you become insolvent or file for bankruptcy, you will be in default and we may:

    (i)    cancel this Agreement and any other agreements Pitney Bowes has with you;

    (ii)    require you to pay to us immediately all amounts payable under the Lease or other agreements, whether then due or payable in the future;

    (iii)    disable the Meter;

    (iv)    require you to return the Equipment, Meter and software;

    (v)    if you don't return the Equipment, require you to immediately pay to us an amount equal to the value of the Equipment, as determined by us;

    (vi)    charge you a late charge for each month that your payment is late;

    (vii)    charge you a check return fee for payments made by you with insufficient funds; and

    (viii)    pursue any other remedy, including repossessing the Equipment and Meter without notice to you. To the extent permitted by law, you waive any notice of our repossession or disposition of the Equipment or Meter. By repossessing the Equipment or Meter, we aren't waiving our right to collect the balance due.

(b)    You agree to pay all our costs, including attorneys' fees, incurred in enforcing our rights.

(c)    We may suspend any services during any period that your account is more than thirty days past due.

## 4.    Taxes

You agree to pay us for all sales, use, property or other taxes (excluding taxes on net income) related to the Lease or rental agreement based on or measured by your payments, the Equipment, Equipment location, Meter and Meter location. We will determine the amount of all property and similar taxes to be charged to you based on our reasonable valuation of the Equipment or of the Meter, taking into consideration tax rates and depreciation. You agree to pay a tax administrative charge set by us without reference to the tax charged or services performed; such fee and charge won't exceed a total of $35 per year for each Lease schedule or rental agreement.

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved. Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

**5.    Embedded Software and Subscription Services**

(a)    Our Equipment may contain embedded software.  For embedded software, you agree that: (i) we and our licensors own the copyrights and other intellectual property to it; (ii) you are licensed only to use it with our Equipment in which it resides; (iii) you won't copy, modify, de-compile, or attempt to unbundle, reverse engineer or create derivative works of it, unless allowed by law; (iv) you won't distribute or disclose it (or any portion) to anyone; and (v) you won't export it in violation of export control laws.  The embedded software may contain third party software which is subject to any terms accompanying it.  Technical support for embedded software will be given according to the SLA covering the Equipment with the embedded software.

(b)    We may offer certain on-demand services to you on a subscription basis according to your Order.  Upon your payment of the subscription fees, we grant you a non-exclusive, non-transferable license to access and use the subscription services for the term set forth in the Order for your internal business purposes only.  You can't give access to the subscription services to anyone else, or use the subscription services on behalf of anyone else without our written consent.  You will comply with all laws, rules and regulations governing your use of the subscription services, including any data protection or privacy laws.  You won't use the services to send or store infringing, obscene, threatening or unlawful material or disrupt the use by others of the subscription services, network service or network equipment, and you won't reverse engineer, decompile or disassemble the subscription services. If the subscription services you purchased come with their own terms of use, your use will be covered by those terms.  Maintenance and technical support for any on-demand services will be provided under a separate agreement.

**6.    Internet Access Point**

The internet connectivity for the Equipment or Meter may use an internet access point provided by us.  You may only use this access point for connectivity between the Equipment or Meter and the internet and for no other purpose.  You agree to pay all costs resulting from the use of the access point in violation of this restriction.

**7.    Security Interest**

You grant us a purchase money security interest in the Equipment, any replacements, and any proceeds from the sale of the Equipment, to secure payment of any balance due.  We have the right to recover the Equipment if you haven't paid for it.  We may file a copy of this Agreement as a financing statement with the State authorities.  If you are leasing Equipment, you authorize us to file a Uniform Commercial Code financing statement naming you as debtor/lessee with respect to the Equipment in order to protect our interest in the Equipment.

**8.    Export Laws**

You agree: (i) to comply with all U.S. export control laws and regulations; (ii) not to export, re-export, or transfer any products and technologies received in an Order to any destination or to any person if prohibited by any U.S. law or regulation; and (iii) to immediately notify us in writing if you or one of your affiliates is or becomes listed in any Denied Parties List or if your or any of your affiliates export privileges are denied, suspended or revoked by any U.S. Government entity.

**9.    Analog Connectivity**

**IF YOU USE AN ANALOG CONNECTION FOR YOUR MAILING SYSTEM, YOU ACKNOWLEDGE THAT THE ANALOG CONNECTIVITY IS PROVIDED BY A THIRD PARTY SUPPLIER. NEITHER WE NOR OUR SUPPLIER PROVIDES ANY WARRANTY WITH RESPECT TO THE FUNCTIONALITY OR QUALITY OF THE ANALOG CONNECTION. IF THE THIRD PARTY SUPPLIER NO LONGER PROVIDES ANALOG CONNECTION CAPABILITY, WE WON'T BE RESPONSIBLE FOR PROCURING AN ALTERNATIVE SUPPLIER AND YOU WILL HAVE TO USE A DIGITAL CONNECTION.**

Pitney Bowes Terms (Version 7/17)
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM  2025CH04542

**10.**     **Miscellaneous**

(a)     You agree to use the Equipment and Meter only for business or commercial purposes, and not for personal, family, or household purposes.

(b)     Your use of any application will be subject to the terms of use provided at the time of your first login.

(c)     We aren't responsible for any delay or failure to perform resulting from causes outside of our control.

(d)     You may not assign this Agreement without our prior written consent.  Any assignment without our consent is void.

(e)     Payments aren't subject to setoff or reduction.

(f)     **ANY LEGAL ACTION YOU FILE AGAINST US MUST BE STARTED WITHIN ONE YEAR AFTER THE EVENT GIVING RISE TO YOUR CLAIM. YOU WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATED TO THIS AGREEMENT.**

(g)     We can only change this Agreement if we both agree to do so in writing. You may use a purchase order to offer to obtain equipment or services but none of its provisions will modify or supersede these provisions unless we expressly agree in writing.  If any provision in this Agreement is found to be invalid or unenforceable, the remaining provisions won't be affected.

(h)     Our respective rights and obligations under Sections 2 (Limitation of Liability), 3 (Default and Remedies) and 4 (Taxes) will survive termination of this Agreement.

(i)     We may deliver any notice and other communication to you under this Agreement by email to the email address that we have on file for you.  You agree to the delivery of these notices and other communications by email.  We may call you at any number you give to us.

(j)     This Agreement is governed by the laws of the State of Delaware.

(k)     You agree that we can use your name in a client list and identify you as a client when communicating with prospective clients, in each case along with our product or service that you are using.  You agree that we can use your name and logo in marketing content, including in an advertising campaign, with your prior consent.

## LEASE TERMS

**11.     Lease of Equipment; Provider of Leasing Services**

If you are leasing Equipment, these Lease Terms apply.  PBI is the manufacturer of the Equipment. Pitney Bowes Global Financial Services LLC, a wholly-owned subsidiary of PBI ("PBGFS"), provides you with the leasing services. The term of this Lease is the number of months stated on the order (the "**Lease Term**") and begins on the date the Equipment is shipped if we don't install the Equipment, and the date of installation if we install the Equipment. **You may not cancel this Lease for any reason and all payment obligations under this Lease are unconditional.** You understand that we own the Equipment.  PBI owns any Meter as USPS regulations require.  Except as stated in Section 13, you don't have the right to become the owner of the Equipment at the end of the Lease Term.

**12.     Payment Terms**

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

We will invoice you quarterly in advance for all payments on the Order, unless the Order says otherwise (each such payment is a "**Periodic Payment**"). You will make each Periodic Payment by the due date shown on our invoice. Your Periodic Payment may include a one-time origination fee, amounts carried over from a previous lease, software license and maintenance fees and other charges. Any Meter rental fees and SLA fees (collectively "**PBI Payments**") will be included with your Periodic Payment and begin with the start of the Lease Term. After the Lease Term, your Periodic Payment will increase if your PBI Payments increase.

### 13.    End of Lease Options

During the 90 days before your Lease ends, you may, unless you are in default: (i) enter into a new lease with us; (ii) purchase the Equipment "as is, where is" for its fair market value; or (iii) return the Equipment and Meter in their original condition, reasonable wear and tear excepted, and pay us our then applicable processing fee (including any equipment return fee). If you return the Equipment and Meter, you will, as specified by us, either properly pack and return them to us in the return box and with the shipping label provided by us or furnish them to a service carrier specified by us to pick up and ship them to us. If you don't do one of the things listed in clause (i), (ii) or (iii) above, you will be deemed to have agreed to enter into successive month to month extensions of the term of this Lease. You may choose to cancel the automatic extensions at any time by giving us 30 days' written notice. Upon cancellation, you agree to either return all items as provided in this Section 13 or purchase the Equipment.

### 14.    WARRANTY AND LIMITATION OF LIABILITY

**PBI PROVIDES YOU WITH THE LIMITED WARRANTIES IN SECTION 1. PBGFS MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FREEDOM FROM INTERFERENCE OR INFRINGEMENT, AND PBGFS ISN'T LIABLE FOR ANY LOSS, DAMAGE (INCLUDING INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES) OR EXPENSE CAUSED DIRECTLY OR INDIRECTLY BY THE EQUIPMENT.**

### 15.    Equipment Obligations

You will keep the Equipment free from liens and in good condition and working order. We may inspect the Equipment and related maintenance records. You may not move the Equipment from the location specified on the Order without our prior written consent.

### 16.    Risk of Loss and ValueMAX®Program

(a)    You bear the entire risk of loss to the Equipment from the date of shipment by us until the Equipment is returned to, and received by, us, regardless of cause, ordinary wear and tear excepted ("**Loss**"). No Loss will relieve you of any of your obligations under this Lease. You must immediately notify us in writing of any Loss. To protect the Equipment from loss, you will either: (i) keep the Equipment insured against Loss for its full replacement value under a comprehensive policy of insurance or other arrangement that is reasonably satisfactory to us ("**Insurance**"); or (ii) be enrolled in PBGFS' ValueMAX program described in paragraph (b) below.

(b)    YOU MUST CALL US AT 1-800-732-7222 OR GO TO www.pitneybowes.com/us/valuemaxoptout AND PROVIDE US WITH EVIDENCE OF INSURANCE IF YOU DO NOT WISH TO BE ENROLLED IN THE VALUEMAX PROGRAM. If you don't provide evidence of Insurance and haven't previously enrolled in our equipment replacement program (ValueMAX), we may include the Equipment in the ValueMAX program and charge you a fee, which we will include as an additional charge on your invoice. We will provide written notice reminding you of your Insurance obligations described in paragraph (a) above. If the Equipment is included in the ValueMAX program and any damage or destruction to the Equipment occurs (other than from your gross negligence or willful misconduct, which is not covered by ValueMAX), we will (unless you are in default) repair or replace the Equipment. We aren't liable to you if we terminate the

5

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

ValueMAX program.  By providing the ValueMAX program, we aren't offering or selling you insurance; accordingly, regulatory agencies haven't reviewed this Lease, this program or its associated fees, nor are they overseeing our financial condition.

**17.    Other Lease Terms**

(a)    If more than one lessee is named in this Lease, liability is joint and several. You, and any guarantor signing the Order or any documents executed in connection with this Lease, agree to furnish us financial information upon request.  Each of these persons authorizes us to obtain credit reports on them now and in the future.

(b)    You may not assign or sublet the Equipment, the Meter or this Agreement without our prior written  consent.  Any assignment without our consent is void.  We may sell or assign all or part of this Lease or the Equipment but it will not affect your rights or obligations.

(c)    We will provide you with a welcome letter by email.

**SERVICE LEVEL AGREEMENT**

**18.    Applicability of SLA**

This SLA section applies to you if we have entered into an agreement to provide service for any Equipment we lease, rent or sell on the Order, excluding any DI2000 (the covered equipment is called "**Covered Equipment**").

**19.    Service Level Options**

(a)    (i) If you sign up for **Standard SLA** on the Order, PBI will provide at its option either repair or replacement services for the Covered Equipment during the Initial Service Term or any Renewal Service Term (each term as defined in Section 20) (the "**Service Term**"). You are also entitled to: (x) replacement printheads for Covered Equipment without additional charge, except for printheads which need to be replaced as a result of any Excluded Circumstance; and (y) two preventative maintenance service calls per calendar year. PBI will notify you when preventative maintenance is due or you can request preventative maintenance service.  If your Covered Equipment needs repair, PBI may provide repair by remote access, diagnostics and service and/or by on-site repair service. Repair service is provided only for damage resulting from normal wear and tear.  Repair service may include the use of new, reconditioned, or remanufactured parts and assemblies. PBI will provide parts or assemblies for discontinued equipment (or equipment not marketed as new) only if available. If PBI deems it necessary, PBI will dispatch a service technician to arrive at your location for on-site service. You won't incur hourly charges unless service is performed outside Normal Working Hours, which will be done only with your consent. "**Normal Working Hours**" means 8 a.m. – 5 p.m., Monday – Friday, excluding PBI-observed U.S. holidays, in the time zone where the Equipment or other items are located.

(ii)  If PBI determines that replacement of Covered Equipment is necessary, PBI will, at no additional cost to you, promptly ship new, reconditioned, or remanufactured equipment of the same or a functionally equivalent model to replace the affected Covered Equipment. Unless PBI instructs you otherwise, within five days of receiving the replacement equipment, you must pack the Covered  Equipment to be replaced in the shipping carton that contained the replacement equipment, place the pre-paid return address label on the carton, and return it to PBI.  You are responsible for the Covered Equipment until PBI receives it.

(b)    If you are eligible to receive **Performance SLA** under our policies and you sign up for Performance SLA on the Order, you will be entitled to receive: (i) all coverage provided under Standard SLA; (ii) one two-hour application consultation for your mailing and shipping needs; and (iii) admission for one person to a PBI mail management seminar. If PBI determines that on-site service is necessary, PBI will use commercially reasonable efforts to have a service

6

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

technician on-site (during Normal Working Hours only) within 4 hours or 8 hours,  as specified on the Order, after PBI has determined that it can't resolve the issue remotely (the "**Response Time Commitment**"). The Response Time Commitment relates solely to the arrival of a technician at your location.  It isn't a guaranteed resolution of the problem within the Response Time Commitment period, and it doesn't guarantee that all parts necessary to make a repair will be on-site within this time frame.  The Response Time Commitment does not apply to Service designated as service by replacement, relocation services, software maintenance, preventative maintenance, operator training, or other  services not essential to repair the Covered Equipment. If the Covered Equipment is moved from its original location, PBI may, at its option, remove the Response Time Commitment.  If this happens, you will receive Standard SLA and we will adjust the SLA charges payable by you appropriately.  If we don't meet the Response Time Commitment, we will provide you with a credit equal to the difference between the cost of Standard SLA and Performance SLA for three months. In order to receive this credit, you must use a credit request form which you can obtain from your service technician or by calling the Customer Care Center.  The credits are limited to credits for four failures to meet the Response Time Commitment in  any twelve-month period during the Service Term. **These remedies are your sole remedy for PBI's failure to meet the Response Time Commitment.**

**20.**     **Service Term**

PBI will provide you with Service for twelve months, if you don't have a Lease, or for the Lease Term, if you are leasing Equipment (the "**Initial Service Term**"). **SERVICE AUTOMATICALLY RENEWS FOR CONSECUTIVE ONE YEAR TERMS (EACH A "RENEWAL SERVICE TERM") UNLESS YOU TERMINATE YOUR SERVICE AS PROVIDED BELOW OR THE LEASE EXPIRES OR IS TERMINATED OR THE RENEWAL IS PROHIBITED BY LAW.** If you don't wish to renew Service, you must deliver a written notice (the "**Termination Notice**") at least sixty days prior to the renewal of the term to us at 2225 American Drive, Neenah, WI 54956. Your Termination Notice must include your customer account number and lease number (if applicable). PBI reserves the right not to renew your SLA for any reason.

**21.**     **SLA Fees**

You will pay the SLA fees for the Initial Service Term and any Renewal Service Term(s). We may increase the SLA fees after the Initial Service Term, and any increases will be reflected on your invoice. If you receive service for repairs caused by any Excluded Circumstance, PBI will charge you for the service at PBI's current hourly rates and for any required parts.  If you exceed the cycle volume of your Equipment specified on the Order, PBI may bill you for the additional cycles over the specified cycle volume (the additional cycles are called the "Overage").  The charge will be determined by reference to the rate in effect at the time that we determine that an Overage exists.

**22.**     **Service Changes**

PBI may modify its Service by giving written notice to you (a "**Service Change Notice**"), which will state whether the change is material. After receiving a Service Change Notice, if the change is material, you may terminate Service by giving us a termination notice at the address indicated in Section 20.

**23.**     **Additional Service Terms**

You can't elect to have Service apply to some but not all of the items of Equipment. Service doesn't include services and repairs that are made necessary due to any Excluded Circumstance. Service excludes the supply of postal and carrier rate changes and Consumable Supplies. If you replace any of your Covered Equipment during the Service Term, and the replacement Equipment qualifies for Services, PBI will automatically enroll you for maintenance coverage on the new Equipment at PBI's then current annual rates. If you acquire an attachment, or add a unit, to your Covered Equipment, PBI will provide coverage for each attachment or unit which we determine qualifies for coverage under the SLA and adjust your rate accordingly. If you choose not to continue coverage on the replacement Equipment, attachment or unit, you may cancel Service for the item within thirty days of the date of your initial invoice for the item

7

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

from PBI. If you cancel, any further maintenance or repair services on the Equipment, attachment or unit will be subject to PBI's current rates. Standard SLA will apply to rented Equipment at no additional charge.

**EQUIPMENT AND POSTAGE METER RENTAL TERMS**

**24.      Rental**

If you aren't leasing the Equipment and paying for it in your lease payment to PBGFS, we will invoice you the Equipment and Meter rental ("rental") fees listed on the Order. After the period listed on the Order (the "**Initial Term**"), we may increase the rental fees upon at least 30 days' prior written notice. When you receive notice of an increase, you may terminate your rental only as of the date the increase becomes effective. At the end of the Initial Term, the rental term will automatically renew for successive 12-month extensions. If you don't wish to renew the rental term, you must deliver a written notice to us at least 60 days prior to the renewal of the rental term. Upon expiration of the term of the rental, you agree to return Equipment and Meters covered by the rental in their original condition, reasonable wear and tear excepted.

**25.      Postage**

You may transfer funds to The Pitney Bowes Bank, Inc. (the "Bank") for deposit into your Postage By Phone® Reserve Account that you maintain with the Bank (your "**Reserve Account**") or you may transfer funds to the United States Postal Service (the "**USPS**") through a lockbox bank (a "**Lockbox Bank**"). See the "USPS Acknowledgment of Deposit" below for more information. Until the end of the Initial Term, we may charge you a fee of up to $15.00 for refilling your postage. After the Initial Term, we may increase postage refill fees upon 30 days prior written notice. If you participate in any PBI, PBGFS, or Bank postage advance programs (such as Purchase Power), we will advance payment on your behalf to the USPS, subject to repayment by you under the terms of the postage advance program and billed separately from your rental fees.

**26.      Meter Repair or Replacement; Meter Care and Risk of Loss**

If the Meter malfunctions or fails due to reasons other than an Excluded Circumstance, we will repair or replace the Meter. You agree to take proper care of the Meter(s), as stated in this Agreement and any user documentation. You assume all risk of loss or damage to the Meter(s) while you have possession.

**27.      Terms of Use of Meter; Federal Regulations**

You may use the Meter solely for the purpose of processing your mail, provided that you are authorized by the USPS to use the Meter, and that you comply with (i) this Agreement, (ii) any operator guide and (iii) all USPS regulations. You agree to use only attachments or printing devices authorized by us. You must receive our written consent before moving the Equipment or Meter to a different location. Federal regulations require that we own the Meter. Tampering with or misusing the Meter is a violation of federal law. Activities of the USPS, including the payment of refunds for postage by the USPS to clients, will be made in accordance with the current Domestic Mail Manual. If the Meter is used in any unlawful scheme, or isn't used for any consecutive 12 month period, or if you take the Meter or allow the Meter to be taken outside the United States without proper written permission of USPS Headquarters, or if you otherwise fail to abide by the postal regulations and this Agreement regarding care and use of the Meter, then this Agreement and any related Meter rental may be revoked. You acknowledge that any use of this Meter that fraudulently deprives the USPS of revenue can cause you to be subject to civil and criminal penalties applicable to fraud and/or false claims against the United States. The submission of a false or fraudulent statement can result in imprisonment of up to 5 years and fines of up to $10,000 (18 U.S.C. 1001) and a civil penalty of up to $5,000 plus an assessment of twice the amount falsely claimed (3 U.S.C. 3802). The mailing of matter bearing a fraudulent postage meter imprint is an example of a violation of these statutes. You are responsible for immediately reporting (within 72 hours or less) the theft or loss of the Meter to us. Failure to comply with this notification provision in a timely manner may result in the denial of refund of

8

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

any funds remaining on the Meter at the time of loss or theft. You understand that the rules and regulations regarding the use of this Meter as documented in the Domestic Mail Manual may be updated from time to time by the USPS and it is your obligation to comply with any rules and regulations regarding its use.

28.     **Rate Updates and Soft-Guard® Program**

Your Meter or Equipment may require periodic rate updates that you will obtain under our Soft-Guard program. Under the Soft-Guard program, we will provide up to 6 rate updates during each 12 month period following the date of installation of the Equipment. We will provide rate updates only if required due to a postal or carrier change in rate, service, ZIP Code™ or zone change. The Soft-Guard program doesn't cover any change in rates due to custom rate changes, new classes of carrier service, or a change in ZIP Code or zone due to equipment relocation. If you have received the maximum number of rate updates under the Soft-Guard program, you will be billed separately for any additional rate update we provide. We won't be responsible for any losses arising out of or resulting from the failure of rating or software downloads to conform to published rates.

29.     **Collection of Information**

You authorize us to access and download information from your Meter. We may disclose this information to the USPS or other authorized governmental entity. We won't share with any third parties (except the USPS or other governmental entity) individually identifiable information that we obtain about you in this manner unless required to by law or court order. We may elect to share aggregate data about our clients' postage usage with third parties.

30.     **Value Based Services**

Value based services are services the USPS provides, including e-Return Receipt and USPS Confirmation Services. Any fees the USPS charges for these services are your responsibility to pay for and are payable the same way that you pay for postage. The USPS is solely responsible for its services. We are not responsible for any malfunctions of any part of the communication link connecting the Meter with the USPS data system. We have the right to terminate the value based services if the USPS discontinues offering the service or you breach your obligations under this Agreement and fail to cure the breach within thirty days after you have been notified in writing.

**USPS ACKNOWLEDGEMENT OF DEPOSIT**

31.     **Acknowledgement of Deposit**

This section of the agreement provides you with the sections that the USPS requires we include in any agreement where we are renting a meter.   The USPS requires that we use specific language.   The "acknowledgement of deposit" terms are as follows:

(a)     In connection with your use of a Postage Evidencing System as defined in the Code of Federal Regulations ("**CFR**"), you may transfer funds to the USPS through a Lockbox Bank for the purpose of prepayment of postage on Postage Evidencing Systems, generating evidence of postage, both PC Postage and meters (a "**Deposit**"), or you may transfer funds to the Bank for deposit into your Reserve Account.

(b)     To the extent you deposit funds in advance of the use of any evidence of postage, you may make Deposits in the Lockbox Bank account identified as "United States Postal Service CMRS-PB" or make deposits in your Reserve Account, in either case through electronic means, including Automated Clearinghouse Transfers.   The USPS may, at its discretion, designate itself or a successor as recipient of Deposits made by you to the Lockbox Bank account described above.

(c)     Any deposit made by you in your Reserve Account is subject to the Postage By Phone® Reserve Account – Agreement and Disclosure Statement governing your Reserve Account.

9

©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

(d)     Any Deposit made by you in the Lockbox Bank account shall be credited by the USPS only for the payment of evidence of postage.  Such Deposits may be commingled with Deposits of other clients.  You shall not receive or be entitled to any interest or other income earned on such Deposits.

(e)     The USPS will provide a refund to you for the remaining account balances of Deposits held by the USPS.  These refunds are provided in accordance with the rules and regulations governing deposit of funds for evidence of postage, published in the CFR.

(f)     The Lockbox Bank, which shall collect funds on behalf of the USPS, shall provide PBI, on each business day, information as to the amount of each Deposit made to the USPS by you, so that PBI can update its records.

(g)     PBI may deposit funds on your behalf.  The USPS will make no advances of funds to you.  Any relationship concerning advances of funds is between you and PBI, PBGFS and/or the Bank.

(h)     You acknowledge that the terms of this Acknowledgement may be changed, modified, or revoked by the USPS, with appropriate notice.

(i)     Postal Regulations governing the deposit of funds are published in the CFR or its successor.  You acknowledge that you shall be subject to all applicable rules, regulations, and orders of the USPS, including future changes to such rules, regulations, and orders, and such additional terms and conditions as may be determined in accordance with applicable law.  The USPS rules, regulations, and orders shall prevail in the event of any conflict with any other terms and conditions applicable to any Deposit.

## PURCHASE POWER TERMS

### 32.     Purchase Power Program

(a)     The Purchase Power credit line is a product of the Bank and is not available to individuals for personal, family, or household purposes. In order to participate in the Purchase Power program (the "**Program**"), you must provide the information described in paragraph (h) below. You will receive a set of more specific provisions for the Program within thirty days of the date of this Agreement.

(b)     Your Purchase Power account (the "**Account**") will be charged for the amount of postage, products, and services requested and the related fees, if applicable. Unless prohibited by law, you agree to pay the fees and charges of which the Bank has given you notice, including those relating to: (i) applicable transaction or overage fees; (ii) your failure to pay in a timely manner; (iii) your exceeding your credit line; and (iv) fees attributable to the return of any checks.

(c)     You will receive a billing statement for each billing cycle in which you have activity in the Account. The Bank may deliver any statement electronically to the email address that is on file for you. Payments are due by the due date shown on your billing statement. You may pay the entire balance due or a portion of the balance, provided that you pay at least the minimum payment shown on the statement. In the event of a partial payment, you will be responsible for the unpaid balance.

(d)     (i) By using the Program, you agree that whenever there is an unpaid balance outstanding on the Account which is not paid in full by the due date shown on your billing statement, the Bank will charge you, and you will pay, interest on the unpaid balance of the Account from time to time, for each day from the date the transaction is posted to the Account until the date the unpaid balance is paid in full, at a variable rate equal to the Annual Percentage Rate applicable to the Account from time to time. (ii) The Annual Percentage Rate applicable to the Account will be: the greater of (x) 22% and (y) the sum of the highest "Prime Rate" published in the "Money Rates" section of *The Wall Street Journal* on the last business day of the month and the margin set forth below (the sum of the margin and the Prime Rate is herein called the "Floating Rate"). The Annual Percentage Rate will be adjusted on a monthly basis based

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

on any fluctuation in the Floating Rate, if applicable. Any change in the Annual Percentage Rate based on the calculation described in this section will become effective on the first day of your next billing cycle. (iii) The margin which will be added to the Prime Rate to determine the Floating Rate will be 14.75% (using the Prime Rate in effect as of March 31, 2017, the daily periodic rate would be .05137% and the corresponding annual percentage rate would be 18.75%). (iv) The Account balance that is subject to a finance charge each day will include (x) outstanding balances, minus any payments and credits received by the Bank on the Account that day, and (y) unpaid interest, fees, and other charges on the Account. (v) The Bank will charge a minimum finance charge of $1.00 in any billing cycle if the finance charge as calculated above is less than $1.00. (vi) Each payment that you make will be applied to reduce the outstanding balance of the Account and replenish your available credit line. (vii) The Bank may refuse to extend further credit if the amount of a requested charge plus your existing balance exceeds your credit limit.

(e)      The Bank may at any time close or suspend the Account, and may refuse to allow further charges to the Account. Cancellation or suspension will not affect your obligation to pay any amounts you owe.

(f)      The Bank can amend any of the provisions and terms related to the Program at any time by written notice to you (including by electronic notice via the email address that is then on file for you). You are consenting to electronic delivery of any amendments to the Program terms.  Each time you use the Program, you are signifying your acceptance of the terms then in effect. An amendment becomes effective on the date stated in the notice and will apply to any outstanding balance on the Account. The Bank may terminate the Program at any time and will notify you in the event of any termination. Any outstanding obligation will survive termination of the Program.

(g)      The Program and any advances are governed by and construed in accordance with the laws of the State of Utah and applicable federal law.

(h)      USA PATRIOT Act - To help the government fight the funding of terrorism and money laundering activities, Federal law requires financial institutions to obtain, verify and record information that identifies each person who opens an account. Accordingly, in order to activate the Account, the Bank asks that you agree to provide identifying information, including your address and taxpayer identification number. The Bank may also ask for additional identifying information, where appropriate, including asking that your representative who is opening the Account provide his/her name, address, date of birth, driver's license and/or other documents and information that will allow the Bank to identify him/her.  You agree to provide all such requested identifying information.

## PRODUCT SPECIFIC TERMS

### 33.     PBSmartPostageTerms of Use
If you have ordered pbSmartPostage, your use of that product will be subject to the Terms of Use which are available at pitneybowes.com/us/license-terms-of-use/smart-postage-terms-and-conditions.html and are incorporated by reference.  Your use of pbSmartPostage is entirely governed by the pbSmartPostage Terms of Use and any other provisions of these Pitney Bowes Terms will not apply to your use.

### 34.     Relay™ Communications HubTerms
If you have ordered services under the Relay Communications Hub, your use of those services will be subject to the Relay Communications Hub Terms which are available at pitneybowes.com/us/license-terms-of-use/relay and are incorporated by reference.  Your use of services under the Relay Communications Hub is entirely governed by the Relay Communications Hub Terms and any other provisions of these Pitney Bowes Terms will not apply.

### 35.     SendPro Terms
If you are acquiring a SendPro subscription: (i) without any SendKit equipment, your use of the product will be subject to the Terms of Use which are available at pitneybowes.com/us/license-terms-of-use/sendpro-subscription.html; and (ii) with any SendKit equipment, your use of the product will be subject to Terms Of Use which are available at pitneybowes.com/us/license-terms-of-use/sendpro-term.html.  The applicable Terms of Use are incorporated by reference.

11

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

Your use of the SendPro application is entirely governed by the SendPro Terms of Use and any other provisions of these Pitney Bowes Terms will not apply to your use.

**36.    DI2000 Inserting System Terms**
Certain provisions which apply when you purchase, lease or rent a DI2000 inserting system and when you purchase a service plan for it are set forth at pitneybowes.com/us/di2000-terms.html and are incorporated by reference.  Those provisions govern to the extent that they are inconsistent with the other terms of this Agreement.

**37.    PBBackup and PC-Backup Service Terms**
Certain provisions which apply when you utilize the PBBackup or PC-Backup services are set forth at pitneybowes.com/us/pbbackup-service-and-pcbackup-service-terms.html and are incorporated by reference.

**Pitney Bowes Terms (Version 7/17)**
©2017 Pitney Bowes Inc. All rights reserved.  Pitney Bowes, the Corporate logo, Connect+, Soft-Guard, Purchase Power, DI2000, SendPro and pbSmartPostage are trademarks of Pitney Bowes Inc. or a subsidiary.

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

# **APPENDIX C**

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

Atty. No. 41106

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

SCHRAMM LAW GROUP, LLC,
on behalf of Plaintiff and the class
members described herein,

            Plaintiff,

    vs.

PITNEY BOWES INC.,

            Defendant.

**AFFIDAVIT OF DANIEL A. EDELMAN**

    Daniel A. Edelman declares under penalty of perjury, as provided for by 735 ILCS 5/1-109, that the following statements are true:

    1.      Edelman, Combs, Latturner & Goodwin, LLC, has 4 principals, Daniel A. Edelman, Tara L. Goodwin, Julie Clark, and Heather Kolbus,  and 3 associates. Member James O. Latturner retired in 2020 and Cathleen M. Combs at the end of  2021.

    2.      **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School.  From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases).  In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982.  From the end of 1985 he has been in private practice in downtown Chicago.  Virtually all of his practice involves litigation on behalf of consumers, through both class and individual actions.  He is the author of the chapters on the "Fair Debt Collection Practices Act," "Truth in Lending Act," and "Telephone Consumer Protection Act" in *Illinois Causes of Action* (Ill. Inst. For Cont. Legal Educ. 2020 and earlier editions), author of  *Collection Litigation: Representing the Debtor*  (Ill. Inst. Cont. Legal Educ. 2008, 2011, 2014, 2019, 2022), author of *Predatory Mortgage Lending* and Servicing (Ill. Inst. for Cont. Legal. Educ. 2022),  co-author of Rosmarin & Edelman, *Consumer Class Action Manual* (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999);, *Illinois Consumer Law*, in Consumer Fraud and Deceptive Business Practices Act and Related Areas Update (Chicago Bar Ass'n 2002); *Payday Loans:  Big Interest Rates and Little Regulation*, 11 Loy.Consumer L.Rptr. 174 (1999); author of *Consumer Fraud and Insurance Claims*, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of Chapter 8, "Fair Debt Collection Practices Act," *Ohio Consumer Law* (1995 ed.); co-author of *Fair Debt Collection:  The Need for Private Enforcement*, 7 Loy.Consumer L.Rptr. 89 (1995); author of *An Overview of The Fair Debt Collection Practices Act*, in Financial Services Litigation, Practicing Law Institute (1999); co-author of *Residential Mortgage Litigation*, in Financial Services Litigation, Practicing Law Institute (1996); author of *Automobile Leasing:  Problems and Solutions*, 7 Loy.Consumer L.Rptr. 14 (1994); author of *Current Trends in Residential Mortgage Litigation*, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); co-author of *Illinois Consumer Law* (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, *Attorney Liability Under the Fair Debt Collection Practices Act* (Chicago Bar Ass'n 1996); and author of *The*

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

*Fair Debt Collection Practices Act: Recent Developments*, 8 Loy.Consumer L. Rptr. 303 (1996), among others. Mr. Edelman is also a frequent speaker on consumer law topics for various legal organizations including the Chicago Bar Association, the National Consumer Law Center's Consumer Rights Litigation Conference, and the Illinois Institute for Continuing Legal Education, and he has testified on behalf of consumers before the Federal Trade Commission and the Illinois legislature. He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Sixth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Courts for the Eastern and Western Districts of Wisconsin, and the Supreme Court of Illinois. He is a member of the Northern District of Illinois trial bar.

3.     **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988) and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991). Ms. Goodwin was Chair of the Chicago Bar Association's Consumer Law Committee from 2007 - 2010, and she has previously been on the faculty of the Practicing Law Institute's Consumer Financial Services Institute in Chicago, speaking on issues relating to the Fair Debt Collection Practices Act and mortgage litigation. Ms. Goodwin spoke at the 2016 Conference on Consumer Finance Law on mortgage servicing issues. Ms. Goodwin has also been a frequent speaker at the Chicago Bar Association, speaking on topics such as how to assist consumers with credit reporting problems, developments in class action law and arbitration agreements in consumer contracts. **Reported Cases.** *Aleksic v. Experian Information Solutions, Inc.*, 13cv7802, 2014 WL 2769122, 2014 U.S. Dist. LEXIS 83086 (N.D.Ill. June 18, 2014); *Taylor v. Screening Reports, Inc.*, 13cv2886, 2015 WL 4052824, 2015 U.S. Dist. LEXIS 86262 (N.D.Ill. July 2, 2015); *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748 (7th Cir. 2000); *Hillenbrand v. Meyer Medical Group*, 288 Ill.App.3d 871, 682 N.E.2d 101 (1st Dist. 1997), later opinion, 308 Ill.App.3d 381, 720 N.E.2d 287 (1st Dist. 1999); *Bessette v. Avco Fin. Servs.*, 230 F.3d 439 (1st Cir. 2000); *Large v. Conseco Fin. Servicing Co.*, 292 F.3d 49 (1st Cir. 2002); *Flippin v. Aurora Bank, FSB*, 12cv1996, 2012 WL 3260449 , 2012 U.S. Dist. LEXIS 111250 (N.D.Ill. Aug. 8, 2012); *Henry v. Teletrack, Inc.*, 11cv4424, 2012 WL 769763, 2012 U.S. Dist. LEXIS 30495 (N.D.Ill. March 7, 2012); *Kesten v. Ocwen Loan Servicing, LLC*, 11cv 6981, 2012 WL 426933, 2012 U.S. Dist. LEXIS 16917 (N.D.Ill. Feb. 9, 2012); *Bunton v. Cape Cod Village, LLC*, 09cv1044, 2009 WL 2139441, 2009 U.S. Dist. LEXIS 57801 (C.D.Ill. July 6, 2009); *Wilson v. Harris N.A.*, 06cvJuly 9, 20205840, 2007 WL 2608521, 2007 U.S. Dist. LEXIS 65345 (N.D.Ill. Sept. 4, 2007); *Carbajal v. Capital One*, 219 F.R.D. 437 (N.D.Ill. 2004); *Russo v. B&B Catering*, 209 F.Supp.2d 857 (N.D.Ill. 2002); *Romaker v. Crossland Mtg. Co.*, 94cv3328, 1996 WL 254299, 1996 U.S.Dist. LEXIS 6490 (N.D.Ill. May 10, 1996); *Mount v. LaSalle Bank Lake View*, 926 F.Supp. 759 (N.D.Ill 1996). Ms. Goodwin is a member of the Illinois bar and is admitted in the Seventh, First, and D.C. Circuit Courts of Appeals, and the United States District Courts for the Northern and Central Districts of Illinois, and the Northern District of Indiana. She is also a member of the Northern District of Illinois trial bar.

4.     **Julie Clark** (neé Cobalovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** *Ballard RN Center, Inc. v. Kohll's Pharmacy and Homecare, Inc.*, 2015 IL 118644, 48 N.E.3d 1060 (Ill.Sup.Ct.) **;** *Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co.*, 377 Ill. App. 3d 642; 880 N.E.2d 205 (1st Dist. 2007); *Qualkenbush v. Harris Trust & Savings Bank*, 219 F. Supp.2d 935 (N.D.Ill. 2002); *Covington-McIntosh v. Mount Glenwood Memory Gardens*, 00cv186, 2002 WL 31369747, 2002 U.S. Dist. LEXIS 20026 (N.D.Ill., Oct. 21, 2002), later opinion, 2003 WL 22359626, 2003 U.S. Dist. LEXIS 18370 (N.D.Ill. Oct. 15, 2003); *Western Ry. Devices Corp. v. Lusida Rubber Prods.*, 06cv52, 2006 WL 1697119, 2006 U.S. Dist. LEXIS 43867

2

FILED DATE: 4/23/2025 12:56 PM    2025CH04542

(N.D.Ill. June 13, 2006); *Nautilus Ins. Co. v. Easy Drop Off, LLC*, 06cv4286, 2007 U.S. Dist. LEXIS 42380 (N.D.Ill. June 4, 2007); *Ballard Nursing Center, Inc. v. GF Healthcare Products, Inc.*, 07cv5715, 2007 WL 3448731, 2007 U.S. Dist. LEXIS 84425 (N.D.Ill. Nov. 14, 2007); *Sadowski v. Med1 Online, LLC*, 07cv2973, 2008 WL 2224892, 2008 U.S. Dist. LEXIS 41766 (N.D.Ill. May 17, 2008); *Sadowski v. OCO Biomedical, Inc.*, 08cv3225, 2008 WL 5082992, 2008 U.S. Dist. LEXIS 96124 (N.D.Ill. Nov. 25, 2008); *ABC Bus. Forms, Inc. v. Pridamor, Inc.*, 09cv3222, 2009 WL 4679477, 2009 U.S. Dist. LEXIS 113847 (N.D.Ill. Dec. 1, 2009); *Glen Ellyn Pharmacy v. Promius Pharma, LLC*, 09cv2116, 2009 WL 2973046, 2009 U.S. Dist. LEXIS 83073 (N.D.Ill. Sept. 11, 2009); *Garrett v. Ragle Dental Lab., Inc.*, 10cv1315, 2010 WL 4074379, 2010 U.S. Dist. LEXIS 108339 (N.D.Ill. Oct. 12, 2010); *Garrett v. Sharps Compliance, Inc.*, 10cv4030, 2010 WL 4167157, 2010 U.S. Dist. LEXIS 109912 (N.D.Ill. Oct. 14, 2010).

5.     **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum laude*, 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** *Clark v. Experian Info. Solutions, Inc.*, 8:00cv1217-22, 2004 WL 256433, 2004 U.S. Dist. LEXIS 28324 (D.S.C., Jan. 14, 2004); *DeFrancesco v. First Horizon Home Loan Corp.*, 06cv0058, 2006 WL 3196838, 2006 U.S. Dist. LEXIS 80718 (S.D.Ill. Nov. 2, 2006); *Jeppesen v. New Century Mortgage Corp.*, 2:05cv372, 2006 WL 3354691, 2006 U.S. Dist. LEXIS 84035 (N.D.Ind. Nov. 17, 2006); *Benedia v. Super Fair Cellular, Inc.*, 07cv1390, 2007 WL 2903175, 2007 U.S. Dist. LEXIS 71911 (N.D.Ill. Sept. 26, 2007); *Gonzalez v. Codilis & Assocs., P.C.*, 03cv2883, 2004 WL 719264, 2004 U.S. Dist. LEXIS 5463 (N.D.Ill. March 30, 2004); *Centerline Equipment Corp. v. Banner Personnel Svc., Inc.*, 07cv1611, 2009 WL 1607587, 2009 U.S. Dist. LEXIS 48092 (N.D.Ill. June 9, 2009); *R. Rudnick & Co. v. G.F. Protection, Inc.*, 08cv1856, 2009 WL 112380, 2009 U.S. Dist. LEXIS 3152 (N.D.Ill. Jan. 15, 2009); *Pollack v. Cunningham Financial Group, LLC*, 08cv1405, 2008 WL 4874195, 2008 U.S. Dist. LEXIS 4166 (N.D.Ill. June 2, 2008); *Pollack v. Fitness Innovative Techs., LLC*, 08 CH 03430, 2009 WL 506280, 2009 TCPA Rep. 1858 (Ill. Cir. Ct., Jan. 14, 2009); *R. Rudnick & Co. v. Brilliant Event Planning, Inc.*, No. 09 CH 18924, 2010 WL 5774848, 2010 TCPA Rep. 2099 (Ill. Cir. Ct., Nov. 30, 2010).

6.     **Associates**:

a.     **Caileen M. Crecco** is a graduate of Loyola University Chicago (B.A., 1992) and DePaul University College of Law (J.D., May 2022). She is a member of the Illinois bar.

b.     **Madeline Brashear** is a graduate of Chapman University, Orange, California (B.A., 2017, M.A., 2018) and Loyola University of Chicago Law School (J.D., May 2022). She is a member of the Illinois bar.

c.     **Alexandra Huzyk** is a graduate of Providence College, Providence, RI (B.A., magna cum laude, 2020) and University of Oregon School of Law, Eugene, OR (J.D. May 2024). She is a member of the Illinois bar.

7.     The firm also has ten legal assistants and support staff.

8.     Since its inception, the firm has recovered more than $500 million for consumers. The types of cases handled by the firm are illustrated by the following:

9.     **Collection practices:** The firm has brought numerous cases under the Fair Debt Collection Practices Act, both class and individual. Decisions include: *Jenkins v. Heintz*, 25 F.3d 536 (7th Cir. 1994), aff'd 514 U.S. 291 (1995) (FDCPA coverage of attorneys); *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636 (7th Cir. 2014)(en banc); *Janetos v. Fulton, Friedman & Gullace, LLP*, 825 F.3d 317 (7th Cir. 2016); *Barbato v. Greystone Alliance, LLC,* 916 F.3d 260 (3d Cir. 2019); *Phillips v. Asset Acceptance, LLC,* 736 F.3d 1076 (7th Cir. 2013); *Soppet v. Enhanced Recovery Co.,* 679 F.3d 637 (7th

3

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

Cir. 2012); *Ruth v. Triumph Partnerships*, 577 F.3d 790 (7th Cir. 2009); *Hale v. Afni, Inc.*, 08cv3918, 2010 WL 380906, 2010 U.S. Dist. LEXIS 6715 (N.D.Ill. Jan. 26, 2010); *Parkis v. Arrow Fin Servs.*, 07cv410, 2008 WL 94798, 2008 U.S. Dist. LEXIS 1212 (N.D.Ill. Jan. 8, 2008); *Foster v. Velocity Investments*, 07cv824, 2007 WL 2461665, 2007 U.S. Dist. LEXIS 63302 (N.D. Ill. Aug. 24, 2007); *Foreman v. PRA III, LLC*, 05cv3372, 2007 WL 704478, 2007 U.S. Dist. LEXIS 15640 (N.D. Ill. March 5, 2007); *Schutz v. Arrow Fin. Services*, 465 F. Supp. 2d 872 (N.D.Ill. 2006); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014), later opinion, 807 F.3d 872 (7th Cir. 2015) (collection of time-barred debts); *Siwulec v. J.M. Adjustment Servs., LLC*, 465 Fed. Appx. 200 (3d Cir. 2012) (activities of mortgage company field agents); *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562 (7th Cir. 2004); *Peter v. GC Servs. L.P.*, 310 F.3d 344 (5th Cir. 2002); *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002) (attorney letters without attorney involvement); *Boyd v. Wexler*, 275 F.3d 642 (7th Cir. 2001); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872 (7th Cir. 2000); *Johnson v. Revenue Management, Inc.*, 169 F.3d 1057 (7th Cir.1999); *Keele v. Wexler & Wexler*, 95cv3483, 1995 WL 549048, 1995 U.S.Dist. LEXIS 13215 (N.D.Ill. Sept. 12, 1995) (motion to dismiss), later opinion, 1996 WL 124452, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996) (class), aff'd, 149 F.3d 589 (7th Cir. 1998); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997); *Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232 (2nd Cir. 1998); *Young v. Citicorp Retail Services, Inc.*, 97-3397, 1998 U.S.App. LEXIS 20268, 159 F.3d 1349 (2nd Cir., June 29, 1998) (unpublished); *Charles v. Lundgren & Assocs., P.C.*, 119 F.3d 739 (9th Cir. 1997); *Avila v. Rubin*, 84 F.3d 222 (7th Cir. 1996), aff'g *Avila v. Van Ru Credit Corp.*, 94cv3234, 1994 WL 649101, 1994 U.S. Dist. LEXIS 16345 (N.D.Ill., Nov. 14, 1994), later opinion, 1995 WL 22866, 1995 U.S. Dist. LEXIS 461 (N.D.Ill., Jan. 18, 1995), later opinion, 1995 WL 41425, 1995 U.S. Dist. LEXIS 461 (N.D.Ill., Jan. 31, 1995), later opinion, 1995 WL 55255, 1995 U.S. Dist. LEXIS 1502 (N.D.Ill., Feb. 8, 1995), later opinion, 1995 WL 683775, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 16, 1995); *Tolentino v. Friedman*, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); *Diaz v. Residential Credit Solutions, Inc.*, 965 F.Supp.2d 249 (E.D.N.Y. 2013), later opinion, 297 F.R.D. 42 (E.D.N.Y. 2014), later opinion, 299 F.R.D. 16 (E.D.N.Y. 2014); *Stubbs v. Cavalry SPV I*, 12cv7235, 2013 WL 1858587, 2013 U.S. Dist. LEXIS 62648 (N.D.Ill., May 1, 2013); *Osborn v. J.R.S.-I., Inc.*, , 949 F. Supp. 2d 807 (N.D.Ill. 2013); *Terech v. First Resolution Mgmt. Corp.*, 854 F.Supp.2d 537, 544 (N.D.Ill. 2012); *Casso v. LVNV Funding, LLC*, 955 F. Supp. 2d 825 (N.D.Ill. 2013); *Simkus v. Cavalry Portfolio Services, LLC*, 11cv7425, 2012 WL 1866542, 2012 U.S. Dist. LEXIS 70931 (N.D.Ill., May 22, 2012); *McDonald v. Asset Acceptance LLC*, 296 F.R.D. 513 (E.D.Mich. 2013); *Ramirez v. Apex Financial Management, LLC*, 567 F. Supp.2d 1035 (N.D. Ill 2008); *Cotton v. Asset Acceptance, LLC*, 07cv5005, 2008 WL 2561103, 2008 U.S. Dist. LEXIS 49042 (N.D.Ill., June 26, 2008); *Buford v. Palisades Collection, LLC*, 552 F. Supp. 2d 800 (N.D.Ill. 2008); *Martin v. Cavalry Portfolio Servs., LLC*, 07cv4745, 2008 WL 4372717, 2008 U.S. Dist. LEXIS 25904 (N.D.Ill., March 28, 2008); *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D.Ill. 2008) (class certified), later opinion, 07cv3840, 2008 WL 2512679, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008) (summary judgment denied); *Hernandez v. Midland Credit Mgmt.*, 04cv7844, 2007 WL 2874059, 2007 U.S. Dist. LEXIS 16054 (N.D.Ill., Sept. 25, 2007) (balance transfer program); *Blakemore v. Pekay*, 895 F.Supp.972 (N.D.Ill. 1995); *Oglesby v. Rotche*, 93cv4183, 1993 WL 460841, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 5, 1993), *later opinion*, 1994 U.S.Dist. LEXIS 4866, 1994 WL 142867 (N.D.Ill., April 18, 1994); *Laws v. Cheslock*, 98cv6403, 1999 WL 160236, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999); *Davis v. Commercial Check Control, Inc.*, 98cv631, 1999 WL 89556, 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); *Hoffman v. Partners in Collections, Inc.*, 93cv4132, 1993 WL 358158, 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); *Vaughn v. CSC Credit Services, Inc.*, 93cv4151, 1994 WL 449247, 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 WL 51402, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); *Beasley v. Blatt*, 93cv4978, 1994 WL 362185, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 11, 1994); *Taylor v. Fink*, 93 C 4941, 1994 WL 669605, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); *Gordon v. Fink*, 93cv4152, 1995 WL 55242, 1995 U.S. Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); *Brujis v. Shaw*, 876 F.Supp. 198 (N.D.Ill. 1995).

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

10.     *Jenkins v. Heintz* is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act.  Mr. Edelman argued it before the Supreme Court and Seventh Circuit.  *Avila v. Rubin* and *Nielsen v. Dickerson*  are leading decisions on phony "attorney letters."  *Suesz v. Med-1 Solutions, LLC* is a leading decision on the FDCPA venue requirements.  *McMahon v. LVNV Funding, LLC* is a leading decision on the collection of time-barred debts.

11.     **Debtors' rights**.  Important decisions include: *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D.Ill. 2008) (class certified), later opinion, 07cv3840, 2008 WL 2512679, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008) (summary judgment denied)  (Illinois statute of limitations for credit card debts); *Parkis v. Arrow Fin Servs.*, 07cv410, 2008 WL 94798, 2008 U.S. Dist. LEXIS 1212 (N.D.Ill. Jan. 8, 2008); *Rawson v. Credigy Receivables, Inc.,*  05cv6032, 2006 WL 418665, 2006 U.S. Dist. LEXIS 6450 (N.D.Ill., Feb. 16, 2006) (same); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014) (collection of time-barred debts without disclosure); *Jones v. Kunin*, 99cv818, 2000 WL 34402017, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000) (scope of Illinois bad check statute); *Qualkenbush v. Harris Trust & Sav. Bank*, 219 F. Supp. 2d 935 (N.D.Ill. 2002) (failure to allow cosigner to take over obligation prior to collection action); *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636 (7th Cir. 2014) (en banc) (venue abuse).

12.     **Telephone Consumer Protection Act.**  The firm has brought a number of cases under the Telephone Consumer Protection Act, 47 U.S.C. §227, which prohibits "junk faxes," spam text messages, robocalls to cell phones, and regulates telemarketing practices. Important junk fax and spam text message decisions include:  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005); *Sadowski v. Med1 Online, LLC*, 07cv2973, 2008 WL 2224892, 2008 U.S. Dist. LEXIS 41766 (N.D.Ill., May 27, 2008); *Benedia v. Super Fair Cellular, Inc.,*  07cv01390, 2007 WL 2903175, 2007 U.S. Dist. LEXIS 71911 (N.D.Ill., Sept. 26, 2007); *Centerline Equip. Corp. v. Banner Pers. Serv.*, 545 F. Supp. 2d 768 (N.D.Ill. 2008); *ABC Business Forms, Inc. v. Pridamor, Inc.*, 09cv3222, 2009 WL 4679477, 2009 U.S. Dist. LEXIS 113847 (N.D.Ill. Dec. 1, 2009); *Glen Ellyn Pharmacy, Inc. v. Promius Pharma, LLC*, 09cv2116, 2009 WL 2973046, 2009 U.S. Dist. LEXIS 83073 (N.D.Ill. Sept. 11, 2009); *Garrett v. Ragle Dental Laboratory, Inc.*, 10cv1315, 2010 WL 3034709, 2010 U.S. Dist. LEXIS, 108339 (N.D.Ill., Aug. 3, 3010).

13.     The firm has also brought a number of cases complaining of robocalling and telemarketing abuse, in violation of the Telephone Consumer Protection Act.  Decisions in these cases include: *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637 (7th Cir. 2012); *Balbarin v. North Star Capital Acquisition, LLC*, 10cv1846, 2011 WL 211013, 2011 U.S. Dist. LEXIS 686 (N.D.Ill. Jan. 21, 2011), *motion to reconsider denied,* 2011 U.S. Dist. LEXIS 58761 (N.D.Ill. 2011); *Sojka v. DirectBuy, Inc.*, 12cv9809 et al., 2014 WL 1089072, 2014 U.S.Dist. LEXIS 34676 (N.D.Ill., Mar. 18, 2014), later opinion, 35 F. Supp. 3d 996 (N.D.Ill. 2014).  The firm has a leadership role in Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act Litigation, MDL No. 2295, and Midland Credit Management, Inc., Telephone Consumer Protection Act Litigation, MDL No. 2286.

14.     **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, which include: *Henry v. Teletrack, Inc.,* 11cv4424,  2012 WL 769763, 2012 U.S. Dist. LEXIS 30495 (N.D.Ill.  March 7, 2012).

15.     Another line of cases under the Fair Credit Reporting Act which we have brought, primarily as class actions, alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA.  *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004); *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006); *Perry v. First National Bank*, 459 F.3d 816 (7th Cir. 2006).

5

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

16.     **Class action procedure:**  Important decisions include *McMahon v. LVNV Funding, LLC*, 807 F.3d 872 (7th Cir. 2015);  *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076 (7th Cir. 2013); *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000);  *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014) (mootness); *Ballard RN Center, Inc. v. Kohll's Pharmacy and Homecare, Inc.*, 2015 IL 118644, 48 N.E.3d 1060 (Ill.Sup.Ct.) (mootness),  and *Gordon v. Boden*, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

17.     **Landlord-tenant:**  The firm has brought more than 20 class actions against landlords to enforce tenants' rights.  Claims include  failing to pay interest on security deposits or commingling security deposits.  Reported decisions include *Wang v. Williams*, 343 Ill. App. 3d 495; 797 N.E.2d 179 (5th Dist. 2003); *Dickson v. West Koke Mill Vill. P'Ship*, 329 Ill. App. 3d 341; 769 N.E.2d 971 (4th Dist. 2002); and *Onni v. Apartment Inv. & Mgmt. Co.*,  344 Ill. App. 3d 1099; 801 N.E.2d 586 (2nd Dist. 2003).

18.     **Mortgage charges and servicing practices:**  The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices.  These include MDL-899, *In re Mortgage Escrow Deposit Litigation*, and MDL-1604, *In re Ocwen Federal Bank FSB Mortgage Servicing Litigation*, as well as the Fairbanks mortgage servicing litigation.  Decisions in the firm's mortgage cases include:  *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525 (7th Cir. 2007); *Johnson v. Thomas*, 342 Ill.App.3d 382,  794 N.E.2d 919 (1st Dist. 2003);   *Handy v. Anchor Mortgage Corp.*, 464 F.3d 760 (7th Cir. 2006); *Christakos v. Intercounty Title Co.*, 196 F.R.D. 496 (N.D.Ill. 2000); *Flippin v. Aurora Bank, FSB*, 12cv1996, 2012 WL 3260449 , 2012 U.S. Dist. LEXIS 111250 (N.D.Ill. Aug. 8, 2012); *Kesten v. Ocwen Loan Servicing, LLC*, 11cv6981, 2012 WL 426933, 2012 U.S. Dist. LEXIS 16917  (N.D.Ill. Feb. 9, 2012); *Johnstone v. Bank of America, N.A.*, 173 F.Supp.2d 809 (N.D.Ill. 2001); *Leon v. Washington Mut. Bank, F.A.*, 164 F.Supp.2d 1034 (N.D.Ill. 2001); *Williamson v. Advanta Mortg. Corp.*, 99cv4784, 1999 WL 1144940, 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); *McDonald v. Washington Mut. Bank, F.A.*, 99cv6884, 2000 WL 875416, 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); *GMAC Mtge. Corp. v. Stapleton*, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); *Leff v. Olympic Fed. S. & L. Ass'n*, 86cv3026, 1986 WL 10636 (N.D.Ill. Sept. 19, 1986); *Aitken v. Fleet Mtge. Corp.*, 90cv3708, 1991 WL 152533, 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. July 30, 1991), later opinion, 1992 WL 33926, 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); *Poindexter v. National Mtge. Corp.*, 94cv45814, 1995 WL 242287, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); *Sanders v. Lincoln Service Corp.*, 91cv4542, 1993 WL 1125433, 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. April 5, 1993); *Robinson v. Empire of America Realty Credit Corp.*, 90cv5063, 1991 WL 26593, 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); *In re Mortgage Escrow Deposit Litigation*, M.D.L. 899, 1994 WL 496707, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 9, 1994); *Greenberg v. Republic Federal S. & L. Ass'n*, 94cv3789, 1995 WL 263457, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

19.     The recoveries in the escrow overcharge cases alone are over $250 million.  *Leff* was the seminal case on mortgage escrow overcharges.

20.     The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

21.     **Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric. *Conley v. Sears, Roebuck*, 1:97cv11149 (D.Mass); *Fisher  v. Lechmere Inc.*, 1:97cv3065 (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

debt by means of an invalid reaffirmation agreement may sue to recover the payment. *Bessette v. Avco Financial Services*, 230 F.3d 439  (1st Cir. 2000).

22.    **Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

a.    Hidden finance charges resulting from pass-on of discounts on auto purchases. *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927 (7th Cir. 1998).

b.    Misrepresentation of amounts disbursed for extended warranties. *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689 (7th Cir. 1998); *Grimaldi v. Webb*, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); *Slawson v. Currie Motors Lincoln Mercury, Inc.*, 94cv2177, 1995 WL 22716, 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 13, 1995); *Cirone-Shadow v. Union Nissan, Inc.*,  955 F.Supp. 938  (N.D.Ill. 1997) (same); *Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302 (N.D.Ill. 1995); *Shields v. Lefta, Inc.*, 888 F. Supp. 891 (N.D.Ill. 1995).

c.    Spot delivery. *Janikowski v. Lynch Ford, Inc.*, 98cv8111, 1999 WL 608714, 1999 U.S. Dist. LEXIS 12258 (N.D.Ill., Aug. 5, 1999); *Diaz v. Westgate Lincoln Mercury, Inc.*, 93cv5428, 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. Nov. 14, 1994); *Grimaldi v. Webb*, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

d.    Force placed insurance. *Bermudez v. First of America Bank Champion, N.A.*, 860 F.Supp. 580 (N.D.Ill. 1994); *Travis v. Boulevard Bank*, 93cv6847, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill. 1995); *Moore v. Fidelity Financial Services, Inc.*, 884 F. Supp. 288 (N.D.Ill. 1995).

e.    Improper obligation of cosigners. *Lee v. Nationwide Cassell*, 174 Ill.2d 540, 675 N.E.2d 599 (1996); *Taylor v. Trans Acceptance Corp.*, 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995);  *Qualkenbush v. Harris Trust & Sav. Bank*, 219 F. Supp. 2d 935 (N.D.Ill. 2002).

f.    Evasion of FTC holder rule. *Brown v. LaSalle Northwest Nat'l Bank*, 148 F.R.D. 584 (N.D.Ill. 1993), later opinion, 820 F.Supp. 1078 (N.D.Ill. 1993), later opinion, 92cv8392, 1993 U.S.Dist. LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

23.    These cases also had a substantial effect on industry practices.  The warranty cases, such as *Grimaldi, Gibson, Slawson, Cirone-Shadow, Chandler,* and *Shields*, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

24.    **Predatory lending practices:**  The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, both as individual and class actions. *Jackson v. Payday Financial LLC*, 764 F.3d 765 (7th Cir. 2014), *cert. denied,* 135 S.Ct. 1894 (2015); *Livingston v. Fast Cash USA, Inc.,* 753 N.E.2d 572 (Ind. Sup. Ct. 2001); *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748 (7th Cir. 2000); *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525 (7th Cir.  2007); *Handy v. Anchor Mortg. Corp.*, 464 F.3d 760 (7th Cir. 2006);  *Laseter v. Climateguard Design & Installation LLC*, 931 F.Supp.2d 862 (N.D.Ill. 2013); *Hubbard v. Ameriquest Mortg. Co.*, 624 F.Supp.2d 913 (N.D.Ill. 2008); *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827 (N.D.Ill. 2007); *Pena v. Freedom Mortg. Team, Inc.*, 07cv552, 2007 WL 3223394, 2007 U.S. Dist. LEXIS 79817 (N.D.Ill., October 24, 2007); *Miranda v. Universal Fin. Group, Inc.*, 459 F. Supp. 2d 760 (N.D.Ill. 2006); *Parker v. 1-800 Bar None, a Financial Corp., Inc.*, 01cv4488, 2002 WL 215530 (N.D.Ill.,  Feb. 12, 2002); *Gilkey v. Central Clearing Co.*, 202

FILED DATE: 4/23/2025 12:56 PM   2025CH04542

F.R.D. 515 (E.D.Mich. 2001); *Van Jackson v. Check 'N Go of Illinois, Inc.*, 193 F.R.D. 544 (N.D.Ill. 2000), later opinion,  114 F. Supp. 2d 731 (N.D.Ill. 2000), later opinion, 123 F. Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F. Supp. 2d 1085 (N.D.Ill. 2000); *Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D.Tex.  2000); *Donnelly v. Illini Cash Advance, Inc.*, 00cv94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); *Jones v. Kunin,* 99cv818, 2000 WL 34402017, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); *Davis v. Cash for Payday*, 193 F.R.D. 518 (N.D.Ill. 2000); *Reese v. Hammer Fin. Corp.*, 99cv716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677 (N.D.Ill., Nov. 29, 1999); *Pinkett v. Moolah Loan Co.*, 99cv2700,  1999 WL 1080596, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); *Gutierrez v. Devon Fin. Servs.*, 99cv 2647, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); *Vance v. National Benefit Ass'n*, 99cv2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

25. **Other consumer credit issues:**  The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

a. Phony nonfiling insurance. *Edwards v. Your Credit Inc.*, 148 F.3d 427 (5th Cir. 1998); *Adams v. Plaza Finance Co.*, 168 F.3d 932  (7th Cir. 1999); *Johnson v. Aronson Furniture Co.*, 96cv117, 1997 U.S. Dist. LEXIS 3979 (N.D.Ill., March 31, 1997), later opinion, 1993 WL 641342 (N.D.Ill., Sept. 11, 1998).

b. The McCarran Ferguson Act exemption. *Autry v. Northwest  Premium Services, Inc.*, 144 F.3d 1037 (7th Cir. 1998).

c. Loan flipping. *Emery v. American General*, 71 F.3d 1343 (7th Cir. 1995). *Emery* limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

d. Home improvement financing practices. *Fidelity Financial Services, Inc. v. Hicks*, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal denied, 141 Ill.2d 539, 580 N.E.2d 112; *Heastie v. Community Bank of Greater Peoria*,  690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990).

e. Insurance packing. *Elliott v. ITT Corp.*, 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

26. **Automobile leases:**  The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions.  Decisions in these cases include *Lundquist v. Security Pacific Automotive Financial Services Corp*., 993 F.2d 11 (2d Cir. 1993); *Kedziora v. Citicorp Nat'l Services, Inc.*, 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 91cv3428,  1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); *Johnson v. Steven Sims Subaru and Subaru Leasing*, 92cv6355, 1993 WL 761231, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 WL 13074115, 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); *McCarthy v. PNC Credit Corp.*, 2:91CV00854 (PCD), 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434 (7th Cir. 1994); *Simon v. World Omni Leasing Inc.*, 146 F.R.D. 197 (S.D.Ála. 1992).

27. *Lundquist* and *Highsmith* are leading cases; both held that commonly-used lease forms violated the Consumer Leasing Act.  As a result of the *Lundquist* case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly

8

improved disclosures to consumers.

28.     **Insurance litigation:** Often securing recovery for a class requires enforcement of the rights under the defendant's insurance policy.  The firm has extensive experience with such litigation.  Reported decisions in such cases include:  *Record-A-Hit, Inc. v. Nat'l Fire Ins. Co.*, 377 Ill. App. 3d 642; 880 N.E.2d 205 (1ˢᵗ Dist. 2007);  *Pietras v. Sentry Ins. Co.*, 06cv3576, 2007 WL 715759, 2007 U.S. Dist. LEXIS 16015 (N.D.Ill., March 6, 2007), later opinion, 513 F. Supp. 2d 983 (N.D.Ill. 2007); *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*,  06cv2092, 2007 WL 2608559, 2007 U.S. Dist. LEXIS 65339 (N.D.Ill., Aug. 31, 2007); *National Fire Ins. Co. v. Tri-State Hose & Fitting, Inc.*, 06cv5256, 2007 U.S. Dist. LEXIS 45685 (N.D.Ill., June 21, 2007); *Nautilus Ins. Co. v. Easy Drop Off, LLC*, 06cv4286, 2007 U.S. Dist. LEXIS 42380 (N.D.Ill., June 4, 2007).

29.     Some of the other reported decisions in our cases include:  *Elder v. Coronet Ins. Co.*, 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); *Smith v. Keycorp Mtge., Inc.*, 151 B.R.  870 (N.D.Ill. 1992); *Gordon v. Boden*, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); *Armstrong v. Edelson*, 718 F.Supp. 1372 (N.D.Ill. 1989); *Newman v. 1st 1440 Investment, Inc.,* 89cv6708, 1993 U.S.Dist. LEXIS 354 (N.D.Ill. Jan. 15, 1993); *Mountain States Tel. & Tel. Co.*, v. District Court, 778 P.2d 667 (Colo. 1989); *Harman v. Lyphomed, Inc.*, 122 F.R.D. 522 (N.D.Ill. 1988); *Haslam v. Lefta, Inc.*, 93cv4311, 1994 WL 117463, 1994 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); *Source One Mortgage Services Corp. v. Jones*, 88cv8441, 1994 WL 13664, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994); *Wilson v. Harris N.A.*, 06cv5840, 2007 WL 2608521, 2007 U.S. Dist. LEXIS 65345 (N.D.Ill. Sept. 4, 2007). *Wendorf v. Landers*, 755 F.Supp.2d 972 (N.D.Ill. 2010); *QuickClick Loans LLC v. Russell*, 407 Ill.App.3d 46; 943 N.E.2d 166 (1st Dist. 2011), *pet. denied*, 949 N.E.2d 1103 (2011) and *Adkins v. Nestle Purina Petcare Co.,* 973 F.Supp.2d 905 (N.D.Ill. 2013).

30.     *Gordon v. Boden* is the first decision approving "fluid recovery" in an Illinois class action.  *Elder v. Coronet Insurance* held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.

Executed at Chicago, Illinois.

          */s/ Daniel A. Edelman*
          Daniel A. Edelman

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 S. Clark Street, Suite 1800
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

FILED DATE: 4/23/2025 12:56 PM  2025CH04542