UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCHRAMM LAW GROUP, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PITNEY BOWES INC.,<br><br>Defendant. | No. 25 CV 5830<br><br>Judge Georgia N. Alexakis |

MEMORANDUM OPINION AND ORDER

Schramm Law Group, LLC, says that ink cartridges that it bought from Pitney Bowes, Inc., stopped operating while they still had ink in them. It brings class-action claims against Pitney Bowes for unfair practices and deceptive practices under the Illinois Consumer Fraud Act, breach of the implied covenant of good faith and fair dealing, unjust enrichment, trespass to chattels, and conversion. Pitney Bowes moves to dismiss all six of Schramm's claims in its first amended complaint. For the reasons that follow, the Court grants Pitney Bowes's motion.

I.     **Legal Standards**

A complaint must contain "a short and plain statement" showing that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint must allege facts sufficient to state a facially plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is

facially plausible if the complaint's "factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

At this stage, the Court assumes that the facts alleged in the complaint are true and draws all reasonable inferences from those facts in the plaintiff's favor. *See Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018). But the Court need not ignore factual allegations that undermine the plaintiff's claim. *See, e.g.*, *Thomas v. Farley*, 31 F.3d 557, 558–59 (7th Cir. 1994). And "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## II. Background

In 2017, Schramm, an Illinois law firm, [18] ¶ 3, leased a "Mailstation2" postage machine from Pitney Bowes, a maker of mailing and postage machines and their ink cartridges, *id.* ¶¶ 5–6. Schramm received a replacement machine around three years later. *Id.* ¶ 11. After that, whenever the machine displayed a low-ink warning, it would stop operating even though the cartridge was not yet empty. *Id.* ¶¶ 12, 14, 19, 24. The machine would also notify Pitney Bowes, which then automatically ordered replacement cartridges on Schramm's behalf as part of Pitney Bowes's "AutoInk" program. *See id.* ¶ 28; [18-1] at 23.

The previous machine was different; it did not stop operating when it displayed a low-ink warning. In fact, it could print many clear postage impressions after the low-ink warning had appeared. [18] ¶ 9. What changed? Pitney Bowes had

2

programmed the chips in the new machine and its ink cartridges to stop the machine from operating when it displayed a low ink warning. *Id.* ¶ 13.

Pitney Bowes made a variety of representations about its ink cartridges in its catalog. For instance, it said that each cartridge would "yield up to 400–880 impressions or 3–4 months." *Id.* ¶ 17. It also said that "[h]igh print quality is assured each time," and that "[a]ctual ink yields vary with usage and environmental conditions." [18-1] at 19. But it never disclosed that the machines would stop printing before the ink cartridges were empty. [18] ¶ 26. As a result, Schramm unknowingly replaced and threw away cartridges that still had ink in them. *Id.* ¶ 29.

Schramm believes that all of this caused financial injuries to it and other similarly situated lessees, *id.* ¶ 27, so it brings six class-action claims: (1) unfair practices under the Illinois Consumer Fraud Act, 815 ILCS 505/2; (2) deceptive practices under the ICFA, 815 ILCS 505/2; (3) breach of the covenant of good faith and fair dealing; (4) unjust enrichment; (5) trespass to chattels; and (6) conversion. [18] ¶¶ 31–98. Pitney Bowes moves to dismiss the complaint. [24].

III. **Analysis**

Pitney Bowes moves to dismiss each of Schramm's six claims. The Court considers each in turn.

    A. **Illinois Consumer Fraud Act Claims**

The ICFA prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. The elements of an ICFA claim are: (1) an unfair or deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception or unfairness; (3) the unfair or deceptive act

3

occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the unfair or deceptive act. *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014) (first citing (*De Bouse v. Bayer AG*, 922 N.E.2d 309, 313 (Ill. 2009); then citing *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012)). Schramm asserts two separate claims under the ICFA, for unfair practices and for deceptive practices. Pitney Bowes says that both claims fail because (among other reasons) Schramm has not alleged facts that plausibly satisfy the first element of either. [25] at 5–8. The Court agrees.

### 1. Unfair Practices

Schramm has not plausibly alleged that Pitney Bowes acted unfairly. Whether a practice is "unfair" under the ICFA depends on three factors: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 961 (quoting *Cheshire Mtg. Serv., Inc. v. Montes*, 223 Conn. 80, 106, 612 A.2d 1130, 1143–44 (1992)).

Pitney Bowes's alleged conduct did not offend public policy. A practice offends public policy when it violates statutory or administrative rules or standards. *See Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 716 (N.D. Ill. 2018) (collecting cases). And "no rule of law" prohibits requiring replacement of a toner cartridge "before the streaking and spotty output that marks the end of [the]

4

cartridge's supply of toner." *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 751 (7th Cir. 2005). The ink cartridges at issue are not meaningfully different from the toner cartridges in *Schorsch*, and Schramm has not pointed out any legal authorities suggesting otherwise. Indeed, if Pitney Bowes did what Schramm would like it to do—allow purchasers to use the cartridges "until they can tell by degraded print quality that ink is in fact running out," [30] at 3—it likely *would* violate public policy. That is because Postal Service rules require postage printing to be legible and to meet specified "reflectance measurements." USPS Domestic Mail Manual § 604.4.3.2.

Schramm disagrees, likening Pitney Bowes's conduct to theft, which, it says, is contrary to public policy. [30] at 6. But it cites neither legal authority nor specific facts in support of its analogy. The Court needn't consider such an "underdeveloped, conclusory, [and] undeveloped" argument.[1] *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

Separately, Pitney Bowes's alleged conduct was not immoral, unethical, oppressive, or unscrupulous. Conduct is immoral, unethical, oppressive, or unscrupulous for purposes of the ICFA if it imposes unexpected costs and "leave[s] the consumer with little choice except to submit." *See Saika*, 357 F. Supp. 3d at 715 (quoting *Newman v. Metro. Life Ins. Co.*, 885 F.3d 995, 1002–03) (collecting cases) (alteration in original). Here, Schramm does not allege that Pitney Bowes imposed any unexpected costs—fees, forfeitures, or anything else. Nor does it allege that

---

[1] The Court also declines to credit the other conclusory assertions Schramm makes in the same paragraph, that Pitney Bowes's conduct is "immoral and unscrupulous" and "causes substantial injury." [30] at 6.

5

Pitney Bowes forced it to purchase new ink cartridges sooner or more frequently than it reasonably could have expected: Pitney Bowes represented in its catalog that an ink cartridge would last up to 400 to 880 impressions or three to four months, [18] ¶ 17, and Schramm does not allege that it replaced any cartridges before reaching those benchmarks, much less that Pitney Bowes forced it to do so.

Finally, Pitney Bowes's alleged conduct did not cause substantial injury to consumers. For an injury to be "substantial," it must be "one that consumers could not have reasonably avoided." *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 712 (N.D. Ill. 2020) (citing *Siegel v. Shell Oil Co.*, 612 F.3d 935, 935 (7th Cir. 2010)). Here, assuming for the sake of argument that Schramm incurred some kind of injury, it was one that consumers reasonably could have avoided by leasing their postal machines from a different company, declining to purchase new ink cartridges, declining to enroll in Pitney Bowes's AutoInk automatic cartridge replacement program, or purchasing postage directly from the USPS instead of through a postage machine. *Cf. Batson v. Live Nation Ent., Inc.*, 746 F.3d 827 (7th Cir. 2014) (holding that a fee attached to a concert ticket was reasonably avoidable by opting for "alternative entertainment"). But Schramm did lease its machine from Pitney Bowes, [18] ¶ 6, and it repeatedly received ink cartridges from Pitney Bowes at a 20-percent discount through its participation in Pitney Bowes's AutoInk program, [18] ¶ 16; [18-1] at 23, 26, 29, 31. Thus, if Schramm experienced any injury, it was avoidable and therefore not "substantial." *Mullen*, 488 F. Supp. 3d at 712.

Because Schramm has failed to allege that Pitney Bowes acted unfairly, Count I is dismissed without prejudice.

### 2. Deceptive Practices

Schramm has not plausibly alleged that Pitney Bowes acted deceptively. The ICFA provides a non-exhaustive list of prohibited deceptive practices: "[(1)] the use … of any deception, fraud, false pretense, false promise, [or] misrepresentation[;] or [(2)] the concealment, suppression[,] or omission of any material fact, with intent that others rely upon the concealment, suppression[,] or omission of such material fact." 815 ILCS 505/2. Claims based on deception, like this one, are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), so Schramm must allege the "who, what, when, where, and how" of the alleged fraud. *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

Schramm says that Pitney Bowes acted deceptively by failing to disclose that it programmed its postage machines and their ink cartridges to stop operating before exhausting the ink in the cartridge. [18] ¶ 44. Because Schramm bases this claim on the alleged omission of a fact, it can only succeed if the allegedly omitted fact is "material." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996). A fact is material if "a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Id*.

Schramm does not allege that buyers would have acted differently had they known that Pitney Bowes's postage machines would stop printing from ink cartridges before exhausting all their ink. The closest it comes to doing so is a conclusory

7

allegation (which the Court needn't credit, *Iqbal*, 556 U.S. at 678) that "[p]urchasers of ink cartridges have a reasonable expectation, when buying ink cartridges, that they have bought all the ink in the cartridge." [18] ¶ 20. But the ICFA "does not redress personal expectations unrooted in a defendant's actual statements." *Odle v. GameStop Corp.*, 774 F. Supp. 3d 982, 999 (S.D. Ill. 2025). And Pitney Bowes's advertising did not reasonably create that expectation, "considering 'all the information available to consumers and the context in which that information is provided and used.'" *Callahan v. Proctor & Gamble Co.*, No. 23 CV 2072, 2024 WL 2892838, at *2 (N.D. Ill. June 10, 2024) (quoting *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 474–75 (7th Cir. 2020)).

Schramm alleges that Pitney Bowes's catalog represented that each cartridge "will yield up to 400–800 impressions or 3–4 months," that "[h]igh print quality is assured each time," and that "[a]ctual ink yields vary with usage and environmental conditions." [18] ¶ 17; [18-1] at 19. The relevant excerpt from the catalog follows:

> Item #SL-870-1
> Red Ink Cartridge for SendPro® Mailstation
> For: SendPro® Mailstation (CSD1)
> Compatible with SendPro® Mailstation only.
>
> 1 × $91.99
>
> **Use genuine Pitney Bowes ink cartridges to keep your meter running.**
> - Tested in millions of cycles, for outstanding reliability and performance
> - Is the only ink formulated by Pitney Bowes for our equipment
> - Meets or exceeds USPS® requirements
> - Optimizes the number of envelopes you can print with each cartridge
> - Yields up to 400-880 impressions
> - Still readable if wet, so even wet mail can be delivered by USPS.
>
> Item #SL-870-1 is genuine Pitney Bowes postage meter ink to be used in the SendPro® Mailstation postage meters. Pitney Bowes supplies are designed and tested within their respective postage meters. One red ink cartridge will yield up to 400 - 880 impressions or 3-4 months. The SL-870-1 cartridge does not prematurely dry up. High print quality is assured each time.
>
> Our SendPro® Mailstation postage meters and red ink have been approved by the USPS. Our meter ink fully meets all USPS requirements. We recommend the use of only genuine Pitney Bowes supply products within our line products. *Actual ink yields vary with usage and environmental conditions.

*Id.* The catalog also showed a picture of a cartridge with a label saying that it contained "8ml" of postal ink. [18-1] at 20.



Nothing in those representations implied that the cartridges would use or were capable of using all the ink they contained. To the contrary, they implied a promise that each impression would be of "high print quality." [18-1] at 19.

And "[c]onsumers are better off with" a cartridge that contains enough ink to ensure 400 high-quality impressions but "require[s] replacement … before the streaking and spotty output that marks the end of a cartridge's supply" than they would be with a "cartridge[] with enough [ink] to last (on average) [400 impressions]." *Schorsch*, 417 F.3d at 751. In other words, the consideration that matters to consumers is the quantity and quality of the cartridge's output, not the volume of ink it uses or contains. Thus, the alleged fact that the cartridges did not use all the ink they contained would not have caused a buyer to "act[] differently," nor is it "the type of information upon which a buyer would be expected to rely in making a decision

9

whether to purchase." *Connick*, 675 N.E.2d at 595. Nor does Schramm allege that the cartridges failed to perform as Pitney Bowes said they would or that the cartridges contained less than the represented eight milliliters of ink.

Schramm does complain, however, that Pitney Bowes's performance representation—that an ink cartridge would yield "400–880 impressions or 3–4 months"—is "so broad" that it "does not amount to a specific promise of anything." [30] at 6. But that performance representation, even if "broad," is still more meaningful to consumers than a representation about the precise volume of ink contained in a cartridge. *See Schorsch*, 417 F.3d at 751.

Schramm also argues that Pitney Bowes's print-quality guarantees are not meaningful because "this case involves manual and semi-automatic postage machines" that "require[] the user to look at the output," so "there is no need to cause the machine to cease operating to avoid streaking and spotty print quality." [30] at 7. But the practicalities of printing do not change the relevant considerations: (1) Pitney Bowes made affirmative representations about the yield and print quality of its ink cartridges; (2) Schramm does not allege that those representations were false; and (3) Schramm does not allege facts that support a reasonable inference that buyers would have acted differently had they known that the cartridges would not use every last drop of the eight milliliters of ink they contained.

There are a few cases in which courts have declined to dismiss claims that were based on false representations that cartridges were "empty." *See Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1266 (C.D. Cal. 2007); *Knox v. Samsung Elecs.*

10

*Am., Inc.*, No. 08-4308JLL, 2009 WL 1810728, at *6 (D.N.J. June 25, 2009). Schramm believes there is no difference between falsely representing that a cartridge is empty (as in these other cases) and representing that ink is low and "shortly thereafter stopping printing when the ink is not empty" (as here, [18] ¶ 24). [30] at 7. But that's not right; there's a decisive difference. The first scenario involves a falsehood, and the second does not.

Because Schramm has failed to allege that Pitney Bowes acted deceptively, Count II is dismissed without prejudice.

### B. Breach of the Covenant of Good Faith and Fair Dealing

Pitney Bowes asks the Court to dismiss Schramm's claim for breach of the implied covenant of good faith and fair dealing because Schramm has not identified an unanticipated contractual gap into which the covenant should be implied. [25] at 11. Schramm argues that Pitney Bowes breached the implied covenant by "[s]urreptitiously taking back what ha[d] been sold," thereby "frustrat[ing] the fruits of the bargain." [30] at 11. The Court agrees with Pitney Bowes.

Delaware law governs this claim, since the lease agreement between Schramm and Pitney Bowes contains a Delaware choice-of-law clause. *See* [18-1] at 9 § 10(j); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015). Under Delaware law, "[t]he implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). Courts should "only imply contract terms

11

when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably." *Id.* at 1126.

Schramm has not alleged any "developments or contractual gaps" that "neither party anticipated." *Id.* at 1125. Nor do its factual allegations support a reasonable inference that Pitney Bowes acted "arbitrarily or unreasonably." *Id.* at 1126. As discussed above, Pitney Bowes assured its customers that every impression made with its cartridges would be of "high quality." [18-1] at 19. It was neither unreasonable nor arbitrary for Pitney Bowes to effectuate that assurance by preventing the cartridges' ink levels from dropping below a certain point. *See Schorsch*, 417 F.3d at 751. That Schramm would have preferred to use the cartridges until the print quality had visibly degraded, [18] ¶ 21, does not change the analysis. *See Nemec*, 991 A.2d at 1126 ("[W]e must ... not rewrite the contract to appease a party who ... now believes [the contract] to have been a bad deal."). Pitney Bowes made representations about its cartridges, and Schramm does not allege that the cartridges failed to perform accordingly. Schramm does not plausibly allege that Pitney Bowes "frustrate[d] the fruits of the bargain." *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022).

Count III is dismissed without prejudice.

### C. Unjust Enrichment

Pitney Bowes next asks the Court to dismiss Schramm's unjust enrichment claim because, it says, Illinois law provides no standalone claim for unjust enrichment, and unjust enrichment is unavailable as a remedy because Pitney Bowes's conduct is the subject of an express contract. [25] at 12. Schramm believes

12

that Illinois law does recognize a claim for unjust enrichment, and its claim is not barred by the existence of its contract with Pitney Bowes. [30] at 11.

The Court need not resolve whether Schramm's contract with Pitney Bowes precludes its unjust enrichment claim; the claim fails for another reason. "Under Illinois law, unjust enrichment is not a separate cause of action." *Vanzant*, 934 F.3d at 739 (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011)). Rather, it's a condition brought about by fraud or other unlawful conduct. *Id.* (citing *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 741 (7th Cir. 2017)). When "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will … stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011); *accord Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019). Here, Schramm's unjust enrichment claim is based on the same alleged conduct as its ICFA claims. *See* [18] ¶¶ 31, 43, 66. "Because [Schramm] failed to state a claim under the ICFA, [it] also failed to state a claim for unjust enrichment." *Benson*, 944 F.3d at 648.

Count IV is dismissed without prejudice.

**D.  Trespass to Chattels and Conversion**

Schramm's last two claims are for the intentional torts of trespass to chattels and conversion. Pitney Bowes argues, among other things, that these claims are barred by Illinois's economic-loss rule. [25] at 13–14. The Court agrees.

"Known as the *Moorman* doctrine in Illinois," the economic-loss rule "bars recovery in tort for purely economic losses arising out of a failure to perform

13

contractual obligations." *Wigod*, 673 F.3d at 567. It applies to claims "rooted in disappointed contractual or commercial expectations," including when a "product disappoints the purchaser's commercial expectations," because "the contract itself serves best to define the parties' respective rights and obligations." *Sienna Ct. Condo Ass'n v. Champion Aluminum Corp.*, 2018 IL 122022, ¶¶ 21–22, 129 N.E.3d 1112, 1119. The key question is whether the duty that Pitney Bowes allegedly breached arose from its contract with Schramm or from some general duty to the public. *See AIT Worldwide Logistics, Inc. v. Pac. Coast Container, Inc.*, No. 23 CV 14616, 2024 WL 4041323, at *6 (N.D. Ill. Sept. 4, 2024) (collecting cases). Claims arising from sales of goods are rooted in contractual duties to which *Moorman* applies. *See Markoff v. Athena Cosms., Inc.*, 764 F. Supp. 3d 733, 747 (N.D. Ill. 2025) ("[This] case involves the sale of tangible goods and the doctrine applies with full force."); *Bruno v. Am. Textile Co.*, No. 22-cv-2937, 2023 WL 6976826, at *5 (N.D. Ill. Oct. 23, 2023) ("Courts in this district consistently deny negligent misrepresentation claims due to the economic loss doctrine in cases where a plaintiff alleges he was duped by deceptive trade practices.").

Here, Schramm alleges that Pitney Bowes committed trespass to chattels and conversion by "programm[ing] its cartridges and printers to deprive [Schramm] of the benefit of the ink remaining in the cartridges." [18] ¶¶ 78, 89. This is, at bottom, a claim that the cartridges do not work as Schramm would like. Schramm does not allege any personal injury or damage to a product other than the cartridge itself.

14

These claims thus fall squarely within a category of claims barred by *Moorman*, those arising when a "product disappoints the purchaser's commercial expectations." *Sienna Ct. Condo Ass'n*, 2018 IL 122022, ¶ 22. Courts from coast to coast have found similar claims barred by other states' economic-loss rules. *See, e.g.*, *Baggett v. Hewlett-Packard Co.*, No. SACV070667AGRNBX, 2009 WL 3178066, at *2 (C.D. Cal. Sept. 29, 2009) (dismissing trespass to chattels and conversion claims for toner cartridges programmed to stop working after a specified number of pages); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 311 (D.N.J. 2009) (same).

Schramm attempts to distinguish the 2009 opinion in *Baggett* by pointing out that, there, the toner cartridge manufacturer promised that the cartridges would print a certain number of pages, and the cartridges did. [30] at 13 (citing *Baggett*, 2009 WL 3178066, at *3). Here, on the other hand, Pitney Bowes did not promise that its ink cartridges would print a specific number of pages. *Id.* But Pitney Bowes did say that its cartridges would last for 400–880 impressions, [18] ¶ 17, and Schramm does not allege that the cartridges lasted for fewer than 400 impressions. The factual distinctions between *Baggett* and *Arcand* and this case are inconsequential; just like the manufacturers in those cases, Pitney Bowes made a promise that, as far as the allegations show, it didn't break.

That fact also bears on whether any of the exceptions to the *Moorman* doctrine apply. There are three possible exceptions: (1) when the plaintiff sustained damage resulting from a sudden or dangerous occurrence; (2) when a defendant's intentional, false representation caused plaintiff's damages; and (3) when the plaintiff's damages

15

were caused by a negligent misrepresentation by a defendant in the business of providing guidance. *AIT Worldwide Logistics*, 2024 WL 4041323, at *6 (citing *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011)). Schramm does not argue that the first or third exception apply, and the Court does not see how they would. And, as noted earlier, Pitney Bowes made no intentional false representation that caused Schramm's alleged damages, so the second exception does not apply. The *Moorman* doctrine thus applies.

Because Schramm's conversion and trespass to chattels claims are barred by Illinois's *Moorman* doctrine, Counts V and VI are dismissed with prejudice.

## IV. Conclusion

For the reasons discussed, the Court grants Pitney Bowes's motion to dismiss. [24]. Counts I, II, III, and IV are dismissed without prejudice. Counts V and VI are dismissed with prejudice.

The Court grants Schramm leave to file a second amended complaint by 3/20/2026 if it can cure the deficiencies the Court has identified while still complying with its Rule 11 obligations. If Schramm does not file an amended complaint by 3/20/2026, the dismissals of Counts I, II, III, and IV will automatically convert to dismissals with prejudice and this case will be terminated.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: 3/6/2026

16